Robert S. Westermann (VSB No. 43294)
Sheila deLa Cruz (VSB No. 65395)
Hirschler Fleischer, P.C.
The Edgeworth Building
2100 East Cary Street
Richmond, Virginia 23223
P.O. Box 500
Richmond, Virginia 23218-0500
Phone: (804) 771-9500
Facsimile: (804) 644-0957
Email: rwestermann@hf-law.com
       sdelacruz@hf-law.com

*Proposed Counsel for Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| In re: | ) |
| | ) |
| MMR HOLDINGS, INC., et al.,[1] | ) Case No. 10-32658-DOT |
| | ) Chapter 11 |
| Debtors. | ) |

**DECLARATION OF NEIL R. BURGESS IN SUPPORT
OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Neil R. Burgess, being duly sworn, depose and say:

1.  I serve as the Chairman, President, and Chief Executive Officer ("CEO"), and am 3.20% owner of MMR Holdings, Inc. ("MMR Holdings"), a corporation incorporated under the laws of the Commonwealth of Virginia. I am authorized to submit this Declaration in support of the Debtors' Chapter 11 petitions and the first day pleadings described herein.

2.  I joined the Company in 1997, and am familiar with all of the Debtors' day-to-day operations, business affairs, books, and records. I have also reviewed the Debtors' "First Day

---

[1] The fourteen (14) Debtors in the cases are MMR Holdings, Inc., and its subsidiaries, *i.e.*, OpenSided MRI of Atlanta, LLC, OpenSided MRI of Cleveland, LLC, OpenSided MRI of Cincinnati, LLC, OpenSided MRI of Denver, LLC, OpenSided MRI of Indianapolis, LLC, OpenSided MRI of Kansas, LLC, OpenSided MRI of Las Vegas, LLC, OpenSided MRI of Louisville, LLC, OpenSided MRI of Oklahoma City, LLC, OpenSided MRI of Orange County, LLC, OpenSided MRI of San Antonio, LLC, OpenSided MRI of New Orleans, LLC, and OpenSided Management, LLC.

Pleadings" and am familiar with the facts alleged therein and the relief requested. I have personal knowledge of the facts, circumstances, and other matters set forth in the First Day Pleadings and in this Declaration, or have gained knowledge of such matters from the Debtors' officers, employees, or retained advisers/consultants that report to me in the ordinary course of my responsibilities. If called as a witness, I would testify as follows:

## INTRODUCTION

3. On April 14, 2010 (the "Petition Date"), the Debtors will file petitions for relief in this Court under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code").

### A. The Debtors' Current Business Operations and Recent Performances

4. MMR Holdings, Inc. ("MMR Holdings") is a privately-held Virginia corporation. MMR Holdings manages the operations and affairs of the thirteen (13) other Debtors (all of which are Virginia limited liability companies), and holds between 70% and 100% of the ownership interests in those Debtors. Twelve (12) of the remaining Debtors (the "Site Debtors") operate independent diagnostic imaging facilities throughout the country. The remaining Debtor, *i.e.*, OpenSided Management, LLC ("OML"), provides marketing and customer service assistance to all of the Debtors. Collectively, the Debtors employ approximately 79 people.

5. The Site Debtors provide diagnostic imaging services to patients who are referred to the Debtors' imaging facilities by doctors to whom the Debtors have marketed their imaging services. One significant advantage to the Debtors' facilities is the "open" technology of the imaging equipment used. In essence, the Debtors' imaging equipment is designed to accommodate patients with special mental and/or physical needs, *e.g.*, those suffering from anxiety, claustrophobia, and/or other similar disorders. This imaging equipment allows the

Debtors to conduct exams on patients who would otherwise refuse an examination/testing or would require sedation to complete the same. Once an examination is completed, the Debtors provide and bill for imaging services, with bills typically being sent to third party payors, such as Medicare, and private insurance companies.

6. The Debtors have a history of profitable operations, but have seen results of operations decline due to a combination of factors: (i) aging equipment relative to certain competitors; (ii) a surge in competition that included an influx of capital and the repeal of certain laws limiting physician ownership of imaging equipment; (iii) an ongoing decrease in reimbursement rates from third party payors; and (iv) a slowing of the growth rate in scan volumes.

### B. The Debtors' Capital Structure

7. Despite the aforementioned factors, the Debtors continued to generate acceptable results of operations until reimbursement rates for imaging services were dramatically lowered by the Deficit Reduction Act of 2005 (the "Act"). Prior to the enactment of the Act, the Debtors' emphasis on marketing and customer service enabled it to replace much of its original referral base with a new base of referring physicians. Profitability was decreased, but the Debtors were generally able to generate sufficient cash to continue to cover their operating costs and reduce their indebtedness.

8. The provisions of the Act were implemented in January 2007, the impact of which began to manifest itself in the Debtors' revenues. For the year 2007, the Debtors suffered a 6.0% loss in revenues, or approximately $1.25 million. The Debtors immediately began an ongoing program to respond to the aggregate revenue loss during 2008 of approximately $2.9 million or 13.0%. Costs have been continually reduced through staff eliminations, contract renegotiation,

3

and other measures, including the cessation of certain unprofitable operations.

9. However, in the fall of 2007, the Debtors anticipated that the combined effects of increased competition and the Act would further impair their ability to service their debt.

10. A substantial portion of the Debtors' long term debt is owed to the finance affiliates of equipment vendors which financed acquisitions of medical imaging equipment. One such vendor is Hitachi Capital Corp. ("Hitachi"), which had financed equipment at eight (8) of the Debtors' imaging facilities. In the fall of 2007, MMR Holdings approached Hitachi in a proactive attempt to renegotiate its repayment terms before circumstances forced the Debtors to suspend payments to Hitachi. The Debtors offered to continue making payments, if Hitachi would agree on suitable changes to their debt service obligations to Hitachi in light of market conditions. The Debtors advised Hitachi that if no such agreement were reached, then the Debtors would be unable to continue to comply with their payment obligations to Hitachi.

11. Hitachi declined to consider any changes to such obligations. Accordingly, the Debtors ceased making payments to Hitachi as of May 2008. Hitachi's security consisted of the Debtors' imaging equipment and MMR Holdings' guaranty of Hitachi's loans to those Debtors operating the imaging facilities.

12. The Debtors' other long term debt is a Bank of America working capital line of credit which is essential to the Debtors' ability to finance their overall day to day operations.

13. The Bank of America credit facility is structured as a loan to MMR Holdings, and is supported by guaranties from the subsidiary Debtors, which have pledged their accounts receivable to Bank of America (except for three (3) of the subsidiary Debtors which pledged their accounts receivables as additional collateral for equipment loans).

14. MMR Holdings provides working capital loans to the subsidiary Debtors as

4

needed, and such Debtors make payments to MMR Holdings as they receive payments on accounts receivable. This arrangement provides certain advantages for all of the Debtors.

15. First, the Debtors' cash flows have been more reliable in aggregate than on an individual basis because a variety of factors can negatively affect any one site that are beyond the control of the other Debtors.

16. Second, it has been impractical to arrange individual working capital loan facilities for each subsidiary Debtor. As the Debtors have generally been unable to finance their operations without this single borrowing facility, MMR Holdings devoted its cash available for debt service to reducing the line of credit and preserving the Debtors' access to capital.

### C. **Events Leading to the Filing of the Reorganization Cases**

17. The Debtors have successfully worked with certain equipment lenders and other creditors to reach settlements, and have pursued other settlements. The Debtors believe their ability to satisfy theirs obligations to creditors will be greatest if the Debtors can continue operations in the ordinary course in order to generate and collect accounts receivable, while also closing certain unprofitable operations and potentially selling certain operations as opportunities to do so arise.

18. Accordingly, the Debtors approached their equipment lenders to request that they agree to a deferred payment schedule and a one-year standstill agreement, which agreement included payments to the equipment vendors subject to the Debtors' available cash. In exchange, the Debtors would grant to the participating equipment vendors second priority liens on accounts receivable as additional collateral for amounts owed to them, with the consent of Bank of America.

19. Two of the Debtors' three equipment lenders expressed agreement in principle to

this "second lien facility." Hitachi, however, declined to entertain the Debtors' offer. Instead, Hitachi commenced litigation, culminating in a confessed judgment in the amount of $628,745.43 dated March 8, 2010, and a garnishment served in connection with the Debtors' accounts dated April 6, 2010, pursuant to such judgment.

20. This garnishment has frozen the Debtors' access to working capital under the Bank of America line of credit, resulting in a liquidity crisis for the Debtors that forced them to seek protection under Chapter 11 of the Federal Bankruptcy Code.

### D. Objectives of the Chapter 11 Filings

21. The Debtors believe that filing for bankruptcy under Chapter 11 is the only avenue that will enable them to maximize the value of their estates.

22. The Debtors base this belief on their experience in collecting medical receivables, which are the primary assets. MMR Holdings is also experienced in closing unprofitable operations and strongly believes that it can continue to achieve its historically high rate of collection if it reorganizes in such a fashion such that it can liquidate unprofitable entities where advisable and to continue to operate sites when such operations contribute to the ultimate value realized by the estate. Conversely, MMR Holdings' experience in collecting accounts receivable of terminated operations indicates that liquidation of the Debtors would yield far lower net proceeds to creditors than would the proposed reorganization.

23. Accordingly, the Debtors are assessing the potential impacts of the most recent healthcare legislation. In addition, the Debtors are evaluating which imaging facilities should continue operations, and which facilities should be closed and liquidated. Numerous factors are involved in this assessment, some of which are just now emerging. The Debtors are precluded from completing this assessment and implementing the resulting plan by the financial distress

caused by the freezing of its accounts pursuant to the Hitachi garnishment. As a result, the Debtors seek a period during which they can prepare the proper plan of reorganization for the benefit of their creditors.

### DEBTORS' FIRST DAY PLEADINGS AND PROPOSED ORDERS

24. In furtherance of its restructuring objectives, the Debtors will file a number of first day pleadings (the "First Day Pleadings") and proposed orders (the "Proposed Orders"), each listed on the attached Exhibit A. The Debtors respectfully request that the Court review the First Day Pleadings and consider entering the Proposed Orders granting the relief sought in such pleadings.

25. I have reviewed each of the First Day Pleadings and the Proposed Orders (including all attached exhibits) and affirm that the facts stated therein are true and accurate to the best of my knowledge, information, and belief, with the appropriate reliance on the Company's officers and retained advisers/consultants. I also conclude that the relief sought in each of the First Day Pleadings and the Proposed Orders: (a) is necessary for enabling the Debtors to transition into Chapter 11 bankruptcy with minimum interruption or disruption to the Debtors' business or loss of productivity or value; (b) constitutes a vital element in the successful reorganization of the Debtors; and (c) ensures that the Debtors comply with applicable non-bankruptcy laws, to the extent that such laws remain applicable in these bankruptcy proceedings.

A. **Administrative Motions**

26. The Debtors expect to file four "administrative" motions, which request: (i) the joint administration of the Debtors' bankruptcy cases; (ii) an expedited, first day hearing to consider the relief requested in each of the First Day Pleadings; (iii) an extension of time for the filing of the Debtors' schedules, statements of financial affairs, and lists of equity security

7

holders; and (iv) an order establishing certain notice, case management and administrative procedures for the Debtors' Chapter 11 cases.. See Exhibit A, Items 1, 2, 3, and 4.

**B.     Motion to Authorize Payment of Pre-Petition Wages, Compensation, and Employee Benefits**

27.     The Debtors will file a motion seeking authority from the Court to continue paying various employee obligations pursuant to Sections 105(a), 363, 507(a)(4), 507(a)(5), 541, 1107(a), and 1108 of the Bankruptcy Code and Rule 6003 of the Bankruptcy Rules. See Exhibit A, Item 5.

28.     To minimize the personal hardship that the Debtors' employees will suffer if pre-petition, employee-related obligations are not paid when due, and to maintain employee morale during this critical time, it is important for the Debtors to have the authority to: (a) pay pre-petition payroll and benefit obligations to employees; (b) reimburse employees for pre-petition expenses incurred by such employees on behalf of the Debtors; and (c) pay pre-petition withholdings and payroll related taxes.

**C.     Motion for Entry of Interim and Final Orders: (A) Authorizing Debtors to (I) Obtain Post-Petition Financing, and (II) Utilize Cash Collateral; (B) Granting Adequate Protection; and (3) Scheduling Interim and Final Hearings**

29.     The Debtors will file a motion seeking authority from the Court, pursuant to Sections 105(a), 361, 362, 363, and 364 of the Bankruptcy Code, and Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to: (i) enter into financing arrangements with their pre-petition lender, Bank of America, N.A. (the "Bank" of "BOA"),to use cash collateral; (ii) provide adequate protection to their pre-petition lender; and (iii) schedule interim and final hearings with respect to the aforementioned relief requested. See Exhibit A, Item 6.

30.     The Bank is the Debtors' current lender and is a secured creditor with a pre-

petition security interest in the Debtors' existing collateral (the "Collateral"). The Debtors seek to enter into post-petition financing arrangements (the "DIP Facility") with the Bank to establish a senior secured, super-priority revolving credit facility of $400,000. The DIP Facility is governed by: (a) the Debtor-in-Possession Loan Agreement (Asset Based) dated April 13, 2010, between MMR Holdings as the borrower, and the Bank, as the lender; (b) the Debtor-In-Possession Revolving Promissory Note dated April 13, 2010 and executed by MMR Holdings for the benefit of the Bank; and (c) if any, related guaranties executed by the Debtors (collectively, the "DIP Financing Agreements").

31. The relevant terms of the DIP Financing Agreements are as follows:[2]

| | |
|---|---|
| Debtor Borrower: | MMR Holdings, Inc. |
| DIP Lender: | Bank of America, N.A. |
| Commitment: | A senior revolving credit facility of $400,000. |
| Borrowing Availability: | Advances to MMR Holdings from time to time, provided that the aggregate amount of such Advances outstanding as of any date of determination does not exceed the Borrowing Base. |
| Use of Loan Proceeds: | The proceeds will be used (a) to repay the Pre-Petition Liabilities owed by MMR Holdings to BOA; (b) to pay fees and expenses incurred in connection with the transactions contemplated hereby and by MMR Holdings' Bankruptcy Case, including the Professional Fee Carve-Out; (c) for general corporate purposes; and (d) for payments permitted to be made under and in accordance with Borrowing Orders that are in a form acceptable to the DIP Lender and approved by the Bankruptcy Court. |
| Term: | The DIP Financing Agreements shall be effective as of the date that the DIP Financing Agreements |

---

[2] This summary refers to the provisions and the defined terms contained in the DIP Financing Agreements. The DIP Financing Agreements shall control in the event of any inconsistencies between the provisions of the Motion, this Declaration, and the DIP Financing Agreements.

9

| | |
|---|---|
| | are approved on an interim basis by the Court and shall continue in full force and effect until such time as MMR Holdings' Loans with BOA have been paid in full, or until December 31, 2010. |
| Priority and Liens: | The DIP Lender shall have a Security Interest, pursuant to a first priority lien, on the Collateral as defined in the DIP Financing Agreements (which Collateral includes property and assets of MMR Holdings and its subsidiaries), under Section 364(d) of the Bankruptcy Code. All Obligations shall constitute administrative expenses of MMR Holdings and its subsidiaries in the Bankruptcy Court, with priority under Section 364(c)(1) of the Bankruptcy Code over any and all other administrative expenses of the kind under any other provision of the Bankruptcy Code. |
| Unused Commitment Fee: | From the date of the DIP Financing Agreements, a fee shall accrue at the rate of 1.00% per annum on the average daily unused amount of the Commitments. Such fee shall be calculated on a quarterly basis by the DIP Lender and shall be due and payable by MMR Holdings in arrears on the last business day of each fiscal quarter of MMR Holdings occurring after the date of the DIP Agreement and on the date of the Expiration Date. |
| Other Fees and Expenses: | MMR Holdings is required to have paid the DIP Lender all fees, costs, and expenses specified in the DIP Financing Agreements as are then due and payable. |
| Interest Rate: | Variable interest rate subject to change from time to time based on changes to the LIBOR Daily Floating Rate. If such rate is not available for any reason, then the rate for that interest period will be determined by an alterative Index as selected by the DIP Lender. |
| Default Interest: | 8.750 percentage points over the Index. |
| Events of Default: | The DIP Financing Agreements contain usual and customary events of default for facilities of this type, including, but not limited to, the following events of default: |

(a) MMR Holdings' failure to make any payment when due under the DIP Documents;

(b) MMR Holdings' failure to comply with or to perform any other term, obligation, covenant, or condition contained in the DIP Documents

(c) Either (i) the appointment in the Bankruptcy Case of a trustee or of any examiner having expanded powers to operate all or any part of the business of MMR Holdings or its subsidiaries, or (ii) the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;

(d) The entry of any order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code which permits any creditor to realize upon, or to exercise any right or remedy with respect to the Collateral;

(e) The Creditors' Committee or any other person or entity with the requisite standing challenges the validity, perfection, priority, or enforceability of the Pre-Petition Liabilities, or any lien, or encumbrance granted with respect to the Pre-Petition Loans, or with respect to the DIP Documents, or any such liens or encumbrances are determined to be null and void, invalid, or unenforceable by the Bankruptcy Court or any other court of competent jurisdiction; and

(f) The filing of any application by MMR Holdings or its subsidiaries without the prior written consent of BOA for the approval of any super-priority claim in the Bankruptcy Case which is pari passu with or senior to the priority of the claims of the DIP Lender for the Obligations, or any such super-priority claim under the Bankruptcy Code.

32. The Debtors also seek authority to enter into, deliver, and perform under the DIP Financing Agreements and to use cash collateral for the interim period beginning on the Petition Date and up to and including May 13, 2010 (the "Interim Period").

33. In exchange for the Debtors' use of cash collateral, and in order to adequately protect the secured interests of the Bank (to the extent that the Bank has a lien in the cash collateral), the Debtors will provide the Bank with, among other things: (a) payments of interest, fees, and expense reimbursements as and when due under the Debtors' pre-petition credit line with the Bank; (b) adequate protection replacement liens on the post-petition Debtor-in-Possession collateral, subject only to the Professional Fee Carve-Out and the DIP Facility; and (c) a superpriority administrative claim subject only to the Professional Fee Carve-Out and the claims of the Bank under the DIP Facility.

34. The relief sought in this Motion is necessary in that the Debtors have an immediate need for liquidity by way of cash collateral and the DIP Facility in order to, among other things: (a) continue the Debtors' respective businesses in the ordinary course of business; (b) preserve the going concern values of the Debtors' estates; (c) enable the Debtors to retain employees; and (d) maintain, restore, and/or establish trade terms for the purposes of continuing the Debtors' use of various equipment.

**D.** **Motion for Entry of an Order: (A) Authorizing Debtors to Continue Using Existing Bank Accounts, Business Forms, and Cash Management System; (B) Authorizing Continued Use of Existing Intercompany Arrangements; and (C) Granting Post-Petition Intercompany Claims Administrative Expense Priority**

35. Pursuant to Sections 105 and 363 of the Bankruptcy Code, and Rule 6003 of the Bankruptcy Rules, the Debtors will file a motion to obtain an order of the Court authorizing, but not directing, the Debtors to continue using their existing: (i) bank accounts, and authorizing a waiver of certain operating guidelines implemented by the United States Trustee's Office for the Eastern District of Virginia relating to debtor-in-possession bank accounts; (ii) business forms and correspondence; (iii) cash management system, including utilizing the services of certain third party service providers; and (iv) intercompany arrangements. In addition, the Debtors also

seek entry of an order of the Court granting administrative expense priority to post-petition claims arising from intercompany transactions between the Debtors under Sections 364(b), 503(b)(1), and 507(a)(2) of the Bankruptcy Code. See Exhibit A, Item 7.

36. The relief sought in this motion is necessary to, among other things: (i) avoid payment delays to creditors; (ii) ensure as minimal disruption of the Debtors' business operations as possible; (iii) enable the Debtors to monitor and track transactions and thereby ensure proper reporting and accounting of such transactions; and (iv) assist the Debtors in the successful completion of these Chapter 11 proceedings.

### E.  MMR Holdings, Inc.'s Motion to Approve Rejection of Executory Contracts

37. MMR Holdings will file a motion with the Court, pursuant to sections 105(a) and 365(a) of the Bankruptcy Code and Rule 6006 of the Bankruptcy Rules, seeking: (i) approval of the rejection of two (2) service agreements executed between MMR Holdings and Hitachi Medical Systems America, Inc. (the "HMSA Contracts"); and (ii) the rejection to be deemed effective as of the Petition Date. See Exhibit A, Item 8.

38. The relief sought in this motion is crucial in that an immediate rejection of the HMSA Contracts will result in the elimination of a significant drain on the Debtors' resources and will reduce post-petition administrative expenses.

### F.  MMR Holdings, Inc.'s Motion to Approve Entry Into Executory Contract

39. Pursuant to Sections 105(a) and 363(b)(1) of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules, MMR Holdings will file a motion for the entry of an order approving entry into a service agreement to be executed post-petition between MMR Holdings and Viable Med Services, Inc. ("VMS"). See Exhibit A, Item 9.

40. The relief sought in this motion is crucial in that it will allow VMS to provide

critical maintenance and repair services for all of the Debtors' equipment located in imaging facilities throughout the country, and for a significantly lower cost than provided for in the rejected HMSA Contracts.

I swear under the penalty of perjury that the facts, circumstances, and other matters set forth in the First Day Pleadings, as well as the foregoing, are true and accurate to the best of my knowledge and belief, with appropriate reliance on the Debtors' officers and retained advisers/consultants.

Dated: April 14, 2010　　　　　　　　　MMR HOLDINGS, INC., et al.

　　　　　　　　　　　　　　　　　　　By: /s/ Neil R. Burgess
　　　　　　　　　　　　　　　　　　　Title: President, Chairman and Chief Executive Officer of MMR Holdings, Inc.