# EXHIBIT A

Execution Version

**Bank of America** ≫

## SECURITY AGREEMENT
### (Multiple Use)

      1. THE SECURITY. The undersigned MMR Holdings Inc., OpenSided MRI of Atlanta, LLC, OpenSided MRI of Cincinnati, LLC, OpenSided MRI of Cleveland, LLC, OpenSided MRI of Denver, LLC, OpenSided MRI, LLC, OpenSided MRI of Kansas, LLC, OpenSided MRI of Las Vegas, LLC, OpenSided MRI of Louisville, LLC, OpenSided MRI of New Orleans, LLC, Opensided MRI of Oklahoma City, LLC, Opensided MRI of Orange County, LLC, and OpenSided of San Antonio, LLC (collectively, the "Pledgor") hereby assigns and grants to Bank of America, N.A. (the "Bank") a security interest in the following described property now owned or hereafter acquired by the Pledgor ("Collateral"):

      (a) Any and all accounts and other rights of Pledgor to the payment for goods sold or leased or for services rendered whether or not earned by performance, including, without limitation, contract rights, book debts, checks, notes, drafts, instruments, chattel paper, acceptances, and any and all amounts due to Pledgor from a factor or other forms of obligations and receivables, now existing or hereafter arising, including rights to payment of money from the Bank under any Swap Contract (as defined in Paragraph 2 below); and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

      (b) All of the Pledgor's deposit accounts with the Bank. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

      (c) All instruments, notes, chattel paper, documents, certificates of deposit, securities and investment property of every type. The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing.

      (d) All negotiable and nonnegotiable documents of title covering any Collateral.

      (e) All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, and all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral and sums due from a third party which has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

      (j) All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

      2. THE INDEBTEDNESS. The Collateral secures and will secure all Indebtedness of MMR Holdings, Inc. to the Bank. Each party obligated under any Indebtedness is referred to in this Agreement as a "Debtor. "Indebtedness" means all debts, obligations or liabilities now or hereafter existing, absolute or contingent of the Debtor or any one or more of them to the Bank, whether voluntary or involuntary, whether due or not due, or whether incurred directly or indirectly or acquired by the Bank by assignment or otherwise, including, without limitation, i) that certain Debtor-In-Possession Loan Agreement (Asset Based) dated as of the date hereof (as amended and/or modified, the "Loan Agreement") between the Borrower and the Bank, ii) that certain Debtor-In-Possession Revolving

Promissory Note dated as of the date hereof in favor of Bank in the original principal amount of $400,000.00 and iii) the Pre-Petition Liabilities (as defined in the Loan Agreement). Indebtedness shall include, without limitation, all obligations of the Debtor arising under any Swap Contract. "Swap Contract" means any interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, securities puts, calls, collars, options or forwards or any combination of, or option with respect to, these or similar transactions now or hereafter entered into between the Debtor and the Bank.

      3. PLEDGOR'S COVENANTS. The Pledgor represents, covenants and warrants that unless compliance is waived by the Bank in writing:

      (a) The Pledgor will properly preserve the Collateral; defend the Collateral against any adverse claims and demands other than those set forth on Schedule 3 (a "Prior Lien") to the extent related to any such lien; and keep accurate Books and Records.

      (b) The Pledgor resides (if the Pledgor is an individual), or the Pledgor's chief executive office (if the Pledgor is not an individual) is located, in the state specified on the signature page hereof. In addition, the Pledgor (if not an individual or other unregistered entity), is incorporated in or organized under the laws of the state specified on such signature page. The Pledgor shall give the Bank at least thirty (30) days notice before changing its residence or its chief executive office or state of incorporation or organization. The Pledgor will notify the Bank in writing prior to any change in the location of any Collateral, including the Books and Records.

      (c) The Pledgor will notify the Bank in writing prior to any change in the Pledgor's name, identity or business structure.

      (d) Unless otherwise agreed and except for the Prior Liens, the Pledgor has not granted and will not grant any security interest in any of the Collateral except to the Bank, and will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature except the security interest of the Bank.

      (e) The Pledgor will promptly notify the Bank in writing of any event which affects the value of the Collateral, the ability of the Pledgor or the Bank to dispose of the Collateral, or the rights and remedies of the Bank in relation thereto, including, but not limited to, the levy of any legal process against any Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise.

      (f) The Pledgor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect the Bank's security interest (collectively, the "Collateral Costs"). Without waiving the Pledgor's default for failure to make any such payment, the Bank at its option may pay any such Collateral Costs, and discharge encumbrances on the Collateral, and such Collateral Costs payments shall be a part of the Indebtedness and bear interest at the rate set out in the Indebtedness. The Pledgor agrees to reimburse the Bank on demand for any Collateral Costs so incurred.

      (g) Until the Bank exercises its rights to make collection, the Pledgor will diligently collect all Collateral.

      (h) If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, the Pledgor shall immediately deliver such document to the Bank, together with any necessary endorsements.

      4. ADDITIONAL REQUIREMENTS. The Pledgor agrees that the Bank may at its option at any time, whether or not the Pledgor is in default:

\11077690.7

    (a) Examine the Collateral, including the Books and Records, and make copies of or extracts from the Books and Records, and for such purposes enter at any reasonable time upon the property where any Collateral or any Books and Records are located.

    (b) Require the Pledgor to deliver to the Bank any instruments, chattel paper or letters of credit which are part of the Collateral, and to assign to the Bank the proceeds of any such letters of credit.

    (c) Notify any account debtors, any buyers of the Collateral, or any other persons of the Bank's interest in the Collateral.

    5. RECEIPT OF PAYMENT.  In the event an Event of Default shall occur and be continuing and a Pledgor (or any of its affiliates, subsidiaries, stockholders, directors, officers, employees or agents) shall receive any proceeds of Collateral, including without limitation monies, checks, notes, drafts or any other items of payment, each Pledgor shall hold all such items of payment in trust for the Bank, and as the property of the Bank, separate from the funds and other property of such Pledgor, and no later than the first banking day following the receipt thereof, at the election of the Bank, such Pledgor shall cause such Collateral to be forwarded to the Bank for its custody, possession and disposition in accordance with the terms hereof and of the other Loan Documents.

    6. DEFAULTS.  Any one or more of the following shall be a default hereunder:

    (a) Any Indebtedness is not paid when due, or any default occurs under any agreement relating to the Indebtedness, after giving effect to any applicable grace or cure periods.

    (b) The Pledgor breaches any term, provision, warranty or representation under this Agreement, and such breach remains uncured after any applicable cure period.

    (c) The Bank fails to have an enforceable first lien (except for any Prior Liens) on or security interest in the Collateral.

    (d) The occurrence of an "Event of Default" under and as defined in the Loan Agreement.

    (e) Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

    (f) The Pledgor has given the Bank any false or misleading information or representations.

    7. BANK'S REMEDIES AFTER DEFAULT.  In the event of any default, the Bank may do any one or more of the following, to the extent permitted by law:

    (a) Declare any Indebtedness immediately due and payable, without notice or demand.

    (b) Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

    (c) Enforce the security interest of the Bank in any deposit account of the Pledgor maintained with the Bank by applying such account to the Indebtedness.

\11077690.7

(d) Require the Pledgor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to the Bank in kind.

(e) Require the Pledgor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under the Bank's exclusive control.

(f) Require the Pledgor to assemble the Collateral, including the Books and Records, and make them available to the Bank at a place designated by the Bank.

(g) Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of the Pledgor's equipment, if the Bank deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(h) Demand and collect any payments on and proceeds of the Collateral. In connection therewith the Pledgor irrevocably authorizes the Bank to endorse or sign the Pledgor's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to the Pledgor and remove therefrom any payments and proceeds of the Collateral.

(j) Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to the Pledgor.

(k) Use or transfer any of the Pledgor's rights and interests in any Intellectual Property now owned or hereafter acquired by the Pledgor, if the Bank deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. The Pledgor agrees that any such use or transfer shall be without any additional consideration to the Pledgor. As used in this paragraph, "Intellectual Property" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which the Pledgor has any right or interest, whether by ownership, license, contract or otherwise.

(l) Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. The Pledgor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(m) Take such measures as the Bank may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and the Pledgor hereby irrevocably constitutes and appoints the Bank as the Pledgor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(n) Without notice or demand to the Pledgor, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by the Bank or any of the Bank's agents or affiliates to or for the credit of the account of the Pledgor or any guarantor or endorser of the Pledgor's Indebtedness.

(o) Exercise any other remedies available to the Bank at law or in equity.

-4-

8. ATTORNEY-IN-FACT. To the extent permitted by law, each Pledgor hereby appoints the Bank as such Pledgor's attorney-in-fact for the purposes of carrying out the provisions of this Security Agreement and taking any action and executing any instrument which the Bank may deem necessary or advisable to accomplish the purposes hereof, which appointment is coupled with an interest and is irrevocable; provided that the Bank shall have and may exercise rights under this power of attorney only upon the occurrence and during the continuance of an Event of Default. Without limiting the generality of the foregoing, upon the occurrence and during the continuance of an Event of Default, the Bank shall have the right and power:

(a)    to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(b)    to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (a) above;

(c)    to endorse such Pledgor's name on any checks, notes, drafts or any other payment relating to or constituting proceeds of the Collateral which comes into the Bank's possession or the Bank's control, and deposit the same to the account of the Bank on account and for payment of the Secured Obligations;

(d)    to file any claims or take any action or institute any proceedings that the Bank may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Bank with respect to any of the Collateral; and

(e)    to execute, in connection with any sale or other disposition of Collateral provided for herein, any endorsement, assignments, or other instruments of conveyance or transfer with respect thereto.

9. PLEDGOR NOT A DEBTOR. If any Pledgor is not a Debtor under some or all of the Indebtedness:

(a) The Pledgor authorizes the Bank, from time to time, without affecting the Pledgor's obligations under this Agreement, to enter into an agreement with the Debtor to change the interest rate on or renew the Indebtedness; accelerate, extend, compromise, or otherwise change the repayment terms or any other terms of the Indebtedness; receive and hold, exchange, enforce, waive, fail to perfect, substitute, or release Collateral, including collateral not originally covered by this Agreement; sell or apply any Collateral in any order; or release or substitute any borrower, guarantor or endorser of the Indebtedness, or other person.

(b) The Pledgor waives any defense by reason of any Debtor's or any other person's defense, disability, or release from liability.

(c) The Pledgor agrees that it is solely responsible for keeping itself informed as to the financial condition of the Debtors and of all circumstances which bear upon the risk of nonpayment. The Pledgor waives any right it may have to require the Bank to disclose to the Pledgor any information which the Bank may now or hereafter acquire concerning the financial condition of the Debtors.

(d) The Pledgor waives all rights to notices of default or nonperformance by the Debtors. The Pledgor further waives all rights to notices of the existence or the creation of new indebtedness by any Debtor and all rights to any other notices to any party liable on any of the Indebtedness.

(e) The Pledgor represents and warrants to the Bank that it will derive benefit, directly and indirectly, from the collective administration and availability of credit under the

-5-

\11077690.7

Indebtedness. The Pledgor agrees that the Bank will not be required to inquire as to the disposition by any Debtor of funds disbursed by the Bank.

(f) Until all obligations to the Bank under the Indebtedness have been paid in full and any commitments of the Bank or facilities provided by the Bank with respect to the Indebtedness have been terminated, the Pledgor waives any right of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including without limitation, any claim or right of subrogation under the Bankruptcy Code (Title 11, United States Code) or any successor statute, which the Pledgor may now or hereafter have against any Debtor with respect to the Indebtedness. The Pledgor waives any right to enforce any remedy which the Bank now has or may hereafter have against any Debtor, and waives any benefit of, and any right to participate in, any security now or hereafter held by the Bank.

(g) The Pledgor waives any right to require the Bank to proceed against any Debtor or any other person; proceed against or exhaust any security; or pursue any other remedy. Further, the Pledgor consents to the taking of, or failure to take, any action which might in any manner or to any extent vary the risks of the Pledgor under this Agreement or which, but for this provision, might operate as a discharge of the Pledgor.

(h) In the event any amount paid to the Bank on any Indebtedness or any interest in property transferred to the Bank as payment on any Indebtedness is subsequently recovered from the Bank in or as a result of any bankruptcy, insolvency or fraudulent conveyance proceeding, the Pledgor shall be liable to the Bank for the amounts so recovered up to the fair market value of the Collateral whether or not the Collateral has been released or the security interest terminated. In the event the Collateral has been released or the security interest terminated, the fair market value of the Collateral shall be determined, at the Bank's option, as of the date the Collateral was released, the security interest terminated, or said amounts were recovered.

10. **REINSTATEMENT.** Each Pledgor agrees that this Security Agreement shall continue to be effective or be reinstated, as the case may be, at any time payment received by the Bank in respect of the Pledgor's Liabilities is rescinded or must be restored for any reason, or is repaid by the Bank in whole or in party in good faith settlement of any pending or threatened avoidance claim.

11. **ANTI-MARSHALING PROVISIONS.** The right is hereby given by each Pledgor to the Bank to make releases (whether in whole or in part) of all or any part of the Collateral agreeable to the Bank without notice to, or the consent, approval or agreement of other parties and interests, including junior lienors, which releases shall not impair in any manner the validity of or priority of the Liens and security interests in the remaining Collateral conferred hereunder, nor release any Pledgor from personal liability for the Indebtedness. Notwithstanding the existence of any other security interest in the Collateral held by the Bank, the Bank shall have the right to determine the order in which any or all of the Collateral shall be subjected to the remedies provided in this Security Agreement. Each Pledgor hereby waives any and all right to require the marshaling of assets in connection with the exercise of any of the remedies permitted by applicable law or provided herein or in any other related document.

12. **TERMINATION.** Subject to reinstatement pursuant to <u>Section 10</u>, this Security Agreement and all obligations of the Pledgors hereunder shall terminate on the later of (i) such time as all of the Pledgors' Indebtedness to Bank has been paid in full, including principal, interest, costs, expenses, attorney's fees and other fees and charges, or (ii) December 31, 2010. Upon such termination of this Security Agreement, the Bank shall, at the request and sole expense of the Pledgors, promptly deliver to the Pledgors such termination statements and take further actions as the Pledgors may reasonable request to terminate of record, or otherwise give appropriate notice of the termination of, any lien conferred hereunder.

-6-

13. MISCELLANEOUS.

(a) Any waiver, express or implied, of any provision hereunder and any delay or failure by the Bank to enforce any provision shall not preclude the Bank from enforcing any such provision thereafter.

(b) The Pledgor shall, at the request of the Bank, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as the Bank may reasonably deem necessary.

(c) All notes, security agreements, subordination agreements and other documents executed by the Pledgor or furnished to the Bank in connection with this Agreement must be in form and substance satisfactory to the Bank.

(d) This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia. To the extent that the Bank has greater rights or remedies under federal law, whether as a national bank or otherwise, this paragraph shall not be deemed to deprive the Bank of such rights and remedies as may be available under federal law. Jurisdiction and venue for any action or proceeding to enforce this Agreement shall be the forum appropriate for such action or proceeding against the Debtor, to which jurisdiction the Pledgor irrevocably submits and to which venue the Pledgor waives to the fullest extent permitted by law any defense asserting an inconvenient forum in connection therewith.

14. BANKRUPTCY COURT ORDERS. All parties to this Agreement acknowledge that this Agreement shall only become effective when approved by the Bankruptcy Court and shall in all respects be subject to the Borrowing Orders and other orders and restrictions of the Bankruptcy Court and the United States Bankruptcy Code.

15. **FINAL AGREEMENT.** **BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

The parties executed this Agreement as of April 14, 2010, intending to create an instrument executed under seal.

\11077690.7

**BANK OF AMERICA, N.A.**

By: _____

Title: _____


Address for Notices:
101 North Tryon Street
NC1-001-13-26
Charlotte, NC 28255


**MMR HOLDINGS, INC., a Virginia
Corporation**

By: _____ (Seal)
Neil Burgess
Title: CEO


**OPENSIDED MRI OF ATLANTA, LLC,
a Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

    By: _____ (Seal)
        Neil Burgess
    Title:    CEO


**OPENSIDED MRI OF CLEVELAND, LLC,
a Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

    By: _____ (Seal)
        Neil Burgess
    Title:    CEO


**OPENSIDED MRI OF DENVER, LLC, a
Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

    By: _____ (Seal)
        Neil Burgess
    Title:    CEO

**OPENSIDED MRI, LLC, a Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

By: _____ (Seal)
Neil Burgess
Title:   CEO


**OPENSIDED MRI OF KANSAS, LLC, a Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

By: _____ (Seal)
Neil Burgess
Title:   CEO


**OPENSIDED MRI OF LAS VEGAS, LLC, a Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

By: _____ (Seal)
Neil Burgess
Title:   CEO


**OPENSIDED MRI OF LOUISVILLE, LLC, a Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

By: _____ (Seal)
Neil Burgess
Title:   CEO


**OPENSIDED MRI OF NEW ORLEANS, LLC, a Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

By: _____ (Seal)
Neil Burgess
Title:   CEO

**OPENSIDED MRI OF OKLAHOMA CITY,
LLC, a Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

    By: _____(Seal)
           Neil Burgess
    Title: _CEO_

**OPENSIDED MRI OF SAN ANTONIO, LLC, a
Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

    By: _____(Seal)
           Neil Burgess
    Title: _CEO_

**BANK OF AMERICA, N.A.**

By: _____

Title: _____

Address for Notices:
101 North Tryon Street
NC1-001-13-26
Charlotte, NC  28255

**MMR HOLDINGS, INC., a Virginia
Corporation**

By: _____ (Seal)
    Neil Burgess
    Title: CEO

**OPENSIDED MRI OF ATLANTA, LLC,
a Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

    By: _____ (Seal)
        Neil Burgess
    Title:    CEO

**OPENSIDED MRI OF CLEVELAND, LLC,
a Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

    By: _____ (Seal)
        Neil Burgess
    Title:    CEO

**OPENSIDED MRI OF DENVER, LLC, a
Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

    By: _____ (Seal)
        Neil Burgess
    Title:    CEO

-8-

**OPENSIDED MRI, LLC, a Virginia limited
liability company**

By:  MMR Holdings, Inc., its Manager

By: _____ (Seal)
          Neil Burgess
Title:   CEO

**OPENSIDED MRI OF KANSAS, LLC, a
Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

By: _____ (Seal)
          Neil Burgess
Title:   CEO

**OPENSIDED MRI OF LAS VEGAS, LLC, a
Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

By: _____ (Seal)
          Neil Burgess
Title:   CEO

**OPENSIDED MRI OF LOUISVILLE, LLC, a
Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

By: _____ (Seal)
          Neil Burgess
Title:   CEO

**OPENSIDED MRI OF NEW ORLEANS, LLC,
a Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

By: _____ (Seal)
          Neil Burgess
Title:   CEO

**OPENSIDED MRI OF OKLAHOMA CITY,
LLC, a Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

By: _____ (Seal)
Neil Burgess
Title:   CEO

**OPENSIDED MRI OF SAN ANTONIO, LLC, a
Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

By: _____ (Seal)
Neil Burgess
Title:   CEO

Pledgor's locations

**MMR Holdings Inc.**
54-1901859Op
301 Concourse Boulevards, Suite 230
Glen Allen, VA 23060

**OpenSided MRI of Atlanta, LLC**
54-1884345
993C Johnson Ferry Road
Suite 115
Atlanta, GA 30342

**OpenSided MRI of Cleveland, LLC**
54-1818953
30400 Detroit Avenue
Suite 30
Westlake, OH 44145

**OpenSided MRI of Denver, LLC**
54-1818954
5250 Leetsdale
Suite 125
Denver, CO 80246

**OpenSided MRI, LLC**
54-1759820
6401 Southeast Street
Suite C
Indianapolis, IN 46227

**OpenSided MRI of Kansas, LLC**
54-1819659
10955 Granada
Overland Park, KS 66211

**OpenSided MRI of Las Vegas, LLC**
54-1783059
650 Rancho Drive
Suite G
Las Vegas, NV 89106

**OpenSided MRI of Louisville, LLC**
54-1835016
120 West Court Avenue
Jeffersonville, IN 47130

**OpenSided MRI of New Orleans, LLC**
54-1818955
1 Galleria Boulevard
Suite 715
Metairie, LA 70001

**OpenSided MRI of Oklahoma City, LLC**
54-1818956

-11-

\1 1077690.7

3500 NW 56th Street
Suite 105
Oklahoma City, OK 73112

**OpenSided MRI of San Antonio, LLC**
54-1817395
5282 Medical Drive
Suite 100
San Antonio, TX 78229

-12-

\11077690.7

**SCHEDULE 3**

**PRIOR LIENS**

-1-

**Bank of America**

┌─────────────────────┐
│  Execution Version  │
└─────────────────────┘

## DEBTOR-IN-POSSESSION REVOLVING PROMISSORY NOTE

| Borrower: | MMR Holdings Inc. | Lender: | Bank of America, N.A. |
|---|---|---|---|
|  | 301 Concourse Blvd |  | CCS-Small Business/Premier |
|  | Suite 230 |  | NC1 -014-13-07 |
|  | Glen Allen, VA 23060 |  | 1111 East Main Street |
|  |  |  | Richmond, VA 23219-3500 |

Principal Amount: $400,000.00          Date of Note: April 14, 2010

**PROMISE TO PAY.** MMR Holdings Inc. ("Borrower") promises to pay to Bank of America, N.A. ("Lender"), or order, in lawful money of the United States of America, the principal amount of Four Hundred Thousand and No/100 Dollars ($400,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**LOAN AGREEMENT.** This Note is the Note referenced in, and is subject to and governed by, the Debtor-In-Possession Loan Agreement (Asset Based), dated as of the date hereof (the "Loan Agreement"), between Borrower and Lender.

**PAYMENT.** Borrower will make all repayments required by the Loan Agreement, including, without limitation, any prepayments arising from any reduction in the Revolving Commitments (as defined in the Loan Agreement) or from any reduction in the Borrowing Base (as defined in the Loan Agreement), and otherwise Borrower will pay all additional amounts owing under this loan in one payment of all outstanding principal plus all accrued unpaid interest on December 31, 2010. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning May 1, 2010, with all subsequent interest payments to be due on the last day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the "LIBOR Daily Floating Rate" which is the fluctuating rate of interest equal to the rate per annum equal to the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or other commercially available source providing quotations of BBA LIBOR as selected by Lender from time to time) as determined for each banking day at approximately 11:00 a.m. London time two (2) business days prior to the date in question, for U.S. Dollar deposits (for delivery on the first day of such interest period) with a one month term, as adjusted from time to time in Lender's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs. If such

PROMISSORY NOTE

Loan No: [＿＿＿＿＿＿]                          (Continued)                                    Page 2

rate is not available at such time for any reason, then the rate for that interest period will be determined by such alternate method as reasonably selected by Lender (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notice to Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each date of such change in the Index. Borrower understands that Lender may make loans based on other rates as well. The interest rate to be applied to the unpaid principal balance of this Note will be at a rate of 4.00 percentage points over the Index. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owned or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Bank of America, N.A., NC1-014-13-07, P.O. Box 30120 Charlotte, NC 28254-3693.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged 4.00% of the unpaid portion of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, Lender, at its option, may, if permitted under applicable law, increase the variable interest rate on this Note to 8.750 percentage points over the Index. The interest rate will not exceed the maximum rate permitted by applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

> **Payment Default.** Borrower fails to make any payment when due under this Note.

> **Other Defaults.** The occurrence of any "Event of Default" under and as defined in the Loan Agreement.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, immediately due and payable, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Subject to any limits under applicable law, upon default, Borrower agrees to pay Lender's attorneys' fees and all of Lender's other collection expenses,

\10970744.9

PROMISSORY NOTE

Loan No: [＿＿＿＿＿＿＿＿]                    (Continued)                    Page 3

whether or not there is a lawsuit, including without limitation legal expenses for bankruptcy proceedings.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Virginia without regard to its conflicts of law provisions. This Note has been accepted by Lender in the Commonwealth of Virginia.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower of any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender reasonably determines there has been any material adverse change in the Borrowing Order in effect at any time.

**NON-RENEWAL.** If this Note is not renewed, Lender in its sole discretion may allow the outstanding balance to be repaid in installments over a term specified by Lender at the time. Borrower specifically understands and agrees that the interest rate applicable to this Note may be increased upon term-out and that the new interest rate will apply to the entire outstanding balance due hereunder. A transaction fee may be charged at Lender's option. If so, the amount will be specified in the term-out notice.

**FINANCIAL STATEMENTS AND OTHER INFORMATION.** Borrower will provide Lender with such financial statements, including tax returns, other statements of condition or other information, in form and content acceptable to Lender, as Lender shall request from time to time within fifteen days of the date of the request.

\10970744.9

PROMISSORY NOTE

Loan No: [＿＿＿＿＿]                    (Continued)                              Page 4

---

**ASSIGMENT**.  Lender may sell or offer to sell this Note, together with any and all documents guaranteeing, securing or executed in connection with this Note, to one or more assignees without notice to or consent of Borrower.  Lender is hereby authorized to share any information it has pertaining to the loan evidenced by this Note, including without limitation credit information on the undersigned, any of its principals, or any guarantors of this Note, to any such assignee or prospective assignee.

**COUNTERPARTS**.  This Note may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**AUTOMATIC PAYMENTS**.  Borrower hereby authorized Lender automatically to deduct from Borrower's account numbered [＿＿＿＿＿] the amount of any loan payment.  If the funds in the account are insufficient to cover any payment, Lender shall not be obligated to advance funds to cover the payment.  At any time and for any reason, Borrower or Lender may voluntarily terminate Automatic Payments.

**PRE-BILLING**.  If the Borrower and Lender elect to use pre-billing calculation, for each payment date (the "Due Date") the amount of each payment debit will be determined as follows:  On the "Billing Date" Lender will prepare and mail to Borrower an invoice of the amounts that will be due on that Due Date ("Billed Amount").  (The "Billing Date" will be a date that is a specified number of calendar days prior to the Due Date, which number of days will be mutually agreed from time to time by Lender and Borrower.)  The calculation of the Billed Amount will be made on the assumption that no new extensions of credit or payments will be made between the Billing Date and the Due Date, and that there will be no changes in the applicable interest rate.  On the Due Date Lender will debit the Designated Account for the Billed Amount, regardless of the actual amount due on that date ("Accrued Amount").  If the Due Date does not fall on a Business Day, Lender shall debit the Designated Account on the first Business Day following the Due Date.  For purposes of this Agreement, "Business Day" means a day other than Saturday, Sunday or other day on which commercial banks are authorized to close or are in fact closed in the state where the Lender's lending office is located.  If the Billed Amount debited to the Designated Account differs from the Accrued Amount, the difference will be treated as follows:  If the Billed Amount is less than the Accrued Amount, the Billed Amount for the following Due Date will be increased by the amount of the underpayment.  Borrower will not be in default by reason of any such underpayment.  If the Billed Amount is more than the Accrued Amount, the Billed Amount for the following Due Date will be decreased by the amount of the overpayment.  Regardless of any such difference, interest will continue to accrue based on the actual amount of principal outstanding without compounding.  Lender will not pay interest on any overpayment.

**TERMINATION OF AUTOMATIC PAYMENTS**.  In the event that Borrower terminates the Automatic Payment arrangement with Lender, Borrower agrees that the interest rate under the Note will increase, at the discretion of the Lender, by one percentage point (1.00%) per annum over the rate of interest stated in the Note, and the amount of each interest installment will be increased accordingly.  The effective rate of interest under the Note shall not in any event exceed the maximum rate permitted by law.

\10970744.9

Loan No: [＿＿＿＿＿＿]

PROMISSORY NOTE
(Continued)

Page 5

**FINAL AGREEMENT.   BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT:   (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RSPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJEC MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

**ADDRESS FOR NOTICES.**  Any notice required to be given under this Note shall be given in writing in accordance with the notice provisions of the Loan Agreement.

**ADVANCES UNDER THE LINE OF CREDIT.**  Except as otherwise provided in this Note, advances under the line of credit provided under this Note will be available until the earlier of any event of default under this Note, or December 31, 2010 (the "Expiration Date").  **Borrowers may borrow, repay and re-borrow under this note at any time until the expiration date.**  The total principal amount outstanding under this Note at any one time must not exceed the principal amount of this Note, provided that the amount advanced hereunder does not exceed any borrowing base or other limitation on borrowings by Borrower.

**SUCCESSOR INTERESTS.**  The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.**  If any part of this Note cannot be enforced, this fact will not affect the rest of the Note.  Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them.  Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor.  Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.  All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.  BORROWER AGREES TO THE TERMS OF THE NOTE.**

PROMISSORY NOTE

Loan No: [＿＿＿＿＿＿]              (Continued)                              Page 6

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**THIS NOTE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS NOTE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

**ALL PROVISIONS OF THIS NOTE AND THE LOAN AGREEMENT ARE SUBJECT TO BANKRUPTCY COURT APPROVAL AND WILL NOT BECOME EFFECTIVE UNTIL SUCH APPROVAL HAS BEEN OBTAINED.   THEREAFTER, ALL SUCH PROVISIONS SHALL REMAIN SUBJECT TO THE REQUIREMENTS AND RESTRICTIONS OF THE BANKRUPTCY COURT.**

\10970744.9

**BORROWER:**

**MMR HOLDINGS INC.**

By:_____(Seal)
      Neil Burgess, CEO of MMR Holdings Inc.

**BORROWER:**

**MMR HOLDINGS INC.**

By:_____(Seal)
    Neil Burgess, CEO of MMR Holdings Inc.

\10970744.9

| Execution Version |
| --- |

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)

| Borrower: | MMR Holdings Inc.<br>301 Concourse Blvd<br>Suite 230<br>Glen Allen, VA 23060 | Lender: | Bank of America, N.A.<br>CCS-Small Business/Premier<br>NCI -014-13-07<br>1111 East Main Street<br>Richmond, VA 23219-3500 |
| --- | --- | --- | --- |

**THIS DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)** dated April 14, 2010, is made and executed between MMR Holdings Inc. ("Borrower") and Bank of America, N.A. ("Lender") on the following terms and conditions.

**BANKRUPTCY CASE.**  On April 14, 2010 (the "Petition Date"), the Borrower commenced Bankruptcy Case No. _____ (the "Bankruptcy Case") by filing voluntary petition(s) for reorganization under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*) (the "Bankruptcy Code") with the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"). Borrower continues to operate its business and manage its properties and subsidiaries as a debtor and debtor-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code.

> **Pre-Petition Loans.**  Borrower acknowledges and agrees that it has received prior commercial loans from Lender, including those which may be described on any exhibit or schedule attached to this Agreement (the "Pre-Petition Loans"), which Pre-Petition Loans were secured by liens upon the accounts receivable and certain other collateral of the Borrower and its subsidiaries.

> **Use of Proceeds.**  In connection with the Bankruptcy Case, Borrower has requested that Lender provide a senior secured, super-priority revolving loan facility, the proceeds of which loan facility only will be used to (a) repay any and all outstanding indebtedness, liabilities and obligations owed by the Borrower pursuant to the Pre-Petition Loans (the "Pre-Petition Liabilities"), (b) to pay fees and expenses incurred in connection with the transactions contemplated hereby and by the Bankruptcy Case, (c) for general corporate purposes and (d) for payments permitted to be made under and in accordance with each borrowing order approving the financing contemplated by this Agreement, which orders shall be in form and substance reasonably acceptable to Lender and entered by the Bankruptcy Court in the Bankruptcy Case (each, a "Borrowing Order") so long as such Borrowing Order has not been stayed, modified in an adverse manner (as determined by the Lender in its sole discretion) or appealed by any party in interest.

> **Borrower's Acknowledgment.**  Borrower understands and agrees that: (A) in granting, renewing, or extending any credit extension under this Agreement (each, a "Loan"), Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

Loan No: [_____]                                              **Page 2**

**TERM**.  This Agreement shall be effective as of the date hereof, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until December 31, 2010.

**LINE OF CREDIT**.  Lender agrees to make Advances to Borrower from time to time from the date of this Agreement to the Expiration Date, provided the aggregate amount of such Advances outstanding as of any date of determination does not exceed the Borrowing Base.  Within the foregoing limit, Borrower may borrow, partially or wholly prepay, and reborrow under this Agreement as follows:

**Conditions Precedent to Each Advance**.  Lender's obligation to make any Advance to or for the account of Borrower under this Agreement is subject to the following conditions precedent, with all documents, instruments, opinions, reports, and other items required under this Agreement to be in form and substance satisfactory to Lender:

(1) Lender shall have received evidence that this Agreement and all Related Documents have been duly authorized, executed, and delivered by Borrower to Lender.

(2) The security interests in the Collateral shall have been duly authorized, created, and perfected with first lien priority and shall be in full force and effect.

(3) All guaranties required by Lender for the credit facility(ies) shall have been executed by each Guarantor, delivered to Lender, and be in full force and effect.

(4) Lender shall be satisfied with any audit of the condition of Borrower's Accounts, books, records and operations, with any such audit to be conducted by and at Lender's request at any reasonable time upon five Business Day's notice to Borrower.

(5) Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

(6) There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement, and Borrower shall have delivered to Lender the compliance certificate called for in the paragraph below titled "Compliance Certificate."

(7) Any Borrowing Order outstanding at any time shall be in form and substance acceptable to Lender in its sole discretion.

(8) The initial Borrowing Order shall have been entered, shall be in full force and effect, and shall not have been reversed, vacated or stayed, or modified without

\10970471.10

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

the prior written consent of the Lender, and all other necessary consents and approvals to transactions contemplated hereby shall have been obtained by Borrower and shall be satisfactory to Lender.

(9) All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with any Borrowing Order shall be in form and substance reasonably satisfactory to the Lender.

**Making Loan Advances**. Advances under this credit facility, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by authorized persons. Lender may, but need not, require that all oral requests be confirmed in writing. Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of Borrower (1) when credited to any deposit account of Borrower maintained with Lender or (2) when advanced in accordance with the instructions of an authorized person. Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

**Mandatory Loan Repayments**. If as of any date of determination the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base. On the Expiration Date, Borrower shall pay to Lender in full the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid.

**Loan Account**. Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the credit facility. Lender shall provide Borrower with periodic statements of Borrower's account, which statements shall be considered to be correct and conclusively binding on Borrower unless Borrower notifies Lender to the contrary within thirty (30) days after Borrower's receipt of any such statement which Borrower deems to be incorrect.

**Unused Commitment Fee**. From the date hereof a fee shall accrue at the rate of 1.00% per annum (computed on the basis of a 360-day year, actual days elapsed) on the average daily unused amount of the Commitments. Such fee shall be calculated on a quarterly basis by Bank and shall be due and payable by the Borrower in arrears on the last business day of each fiscal quarter of the Borrower occurring after the date hereof and on the date of the Expiration Date.

**COLLATERAL**. To secure payment in full in cash of all Borrower's Indebtedness, liabilities and obligations hereunder from time to time (the "Payment Obligations") and performance of all other Loans, obligations and duties owed by Borrower to Lender (the "Performance Obligations"

\10970471.10

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

**Loan No: [_____]**                                                          **Page 4**

and, together with the Payment Obligations, the "Obligations"), Borrower and its subsidiaries shall grant to Lender Security Interests in all the Borrower's accounts receivable and deposit accounts with respect thereto and otherwise, if and to the extent permitted by the Borrowing Order and not otherwise prohibited by any agreement binding upon Borrower or its properties, such other property and assets as Lender may require. Lender's Security Interests in the Collateral shall be continuing liens and shall include the proceeds and products of the Collateral, including without limitation the proceeds of any insurance. With respect to the Collateral, Borrower agrees and represents and warrants to Lender:

**Perfection of Security Interests.** Borrower agrees to execute, and cause each applicable subsidiary to execute, all documents perfecting Lender's Security Interest and to take whatever actions are requested by Lender to perfect and continue Lender's Security Interests in the Collateral. Upon request of Lender, Borrower will deliver or cause to be delivered to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. Contemporaneous with the execution of this Agreement, Borrower will prepare and deliver UCC financing statements and any similar statements as may be required by applicable law, and Lender will file such financing statements and all such similar statements in the appropriate location or locations. Borrower hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue any Security Interest. Lender may at any time, and without further authorization from Borrower or any subsidiary of Borrower, file a carbon, photograph, facsimile, or other reproduction of any financing document for use as a financing statement. Borrower will reimburse Lender for all expenses for the perfection, termination, and the continuation of the perfection of Lender's security interest in the Collateral. Borrower promptly will notify Lender before any change in Borrower's name including any change to the assumed business names of Borrower. Borrower also promptly will notify Lender before any change in Borrower's Social Security Number or Employer Identification Number. Borrower further agrees to notify Lender in writing prior to any change in address or location of Borrower's principal governance office or should Borrower merge or consolidate with any other entity.

**Collateral Records.** Borrower does now, and at all times hereafter shall, keep correct and accurate records of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. With respect to the Accounts, Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Eligible Accounts and Account balances and agings. Records related to Accounts (Receivables) are or will be located at 301 Concourse Blvd., Suite 230, Glen Allen, VA 23060. The above is an accurate and complete list of all locations at which Borrower keeps or maintains business records concerning Borrower's collateral.

\10970471.10

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

Loan No: [＿＿＿＿]                                                            Page 5

**Collateral Schedules**. Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender schedules of Accounts and schedules of Eligible Accounts in form and substance satisfactory to the Lender. Thereafter supplemental schedules shall be delivered according to the following schedule: With respect to Eligible Accounts, schedules shall be delivered monthly within 15 days of reporting period.

**Borrowing Base Certificates**. Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender their Borrowing Base Certificate in form and substance satisfactory to the Lender. Thereafter supplemental Certificates shall be delivered according to the following schedule: With respect to the Borrowing Base Certificate, it shall be delivered monthly within 15 days after month end reporting period.

**Representations and Warranties Concerning Accounts**. With respect to the Accounts, Borrower represents and warrants to Lender that: (1) Each Account represented by Borrower to be an Eligible Account for purposes of this Agreement conforms to the requirements of the definition of an Eligible Account; (2) All Account information listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; and (3) Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect, examine, and audit the records of Borrower and its subsidiaries and to confirm with Account Debtors the accuracy of such Accounts.

**Lien Priority**. At all time, all of the Obligations shall constitute administrative expenses of the Borrower and its subsidiaries in the Bankruptcy Court with priority under Section 364(c)(1) of the Bankruptcy Code over any and all other administrative expenses of any kind under any other provision of the Bankruptcy Code. All liens which secured the Obligations shall constitute first priority liens under Section 364(d) of the Bankruptcy Code, subject only to Permitted Liens that existed as of the Petition Date having priority over liens securing Pre-Petition Liabilities by operation of applicable law.

**CONDITIONS PRECEDENT TO EACH ADVANCE**. Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents**. Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) the Guaranty; (3) the Security Agreement granting to Lender security interests in the Collateral; (4) financing statements and all other documents perfecting Lender's Security Interests; (5) evidence of insurance as required below; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

\10970471.10

**DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Loan No: [_____]                                                      Page 6

**Borrower's Authorization**. Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents by Borrower and any subsidiary party to any Related Document. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Fees and Expenses Under This Agreement**. Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

**Representations and Warranties**. The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct in all material respects, other than those representations and warranties that are qualified as to materiality, which representations and warranties are true and correct in all respects.

**No Event of Default**. There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**Bankruptcy Court Approval**. The Borrower shall have obtained all appropriate and necessary approvals of the Bankruptcy Court.

**REPRESENTATIONS AND WARRANTIES**. Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Obligations exist:

**Organization**. Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the Commonwealth of Virginia. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a materiel adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 10900 Nuckols Road, Suite 220, Glen Allen, VA 23060. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its

\10970471.10

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

**Loan No: [_____]**                                                      **Page 7**

existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.**  Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business:

| Borrower | Assumed Business Name | Filing Location | Date |
|---|---|---|---|
| MMR Holdings Inc. | On file with Lender, if applicable | | |

**Authorization.**  Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.**  Each of Borrower's financial statements supplied to Lender truly and completely disclosed in all material respects Borrower's financial condition as of the date of the statement, and except as set forth on <u>Schedule 1</u> hereto, there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender.  Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.**  This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.**  Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or as set forth on <u>Schedule 2</u> hereto, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.**  Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on,

**DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)**
(Continued)

Loan No: [_____]                                                                    Page 8

under, about or from any of the Collateral. (2) Borrower has no knowledge of or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment and performance of the Obligations and the termination, expiration or satisfaction at this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower or any of its subsidiaries is pending or threatened, and no other event has occurred which may materially adversely affect the financial condition or properties of the Borrower or any of its subsidiaries, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrowers tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

\10970471.10

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

**Loan No:  [_____]**                                                        **Page 9**

**Lien Priority**.   Unless otherwise previously disclosed to Lender in writing, neither Borrower nor any of its subsidiaries has entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of the Payment Obligations, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect**.  This Agreement, the Note, all Security Agreements, and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS**.  Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation**.  Promptly inform Lender in writing of (1) all material adverse changes in the financial condition of Borrower or any of its subsidiaries, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records**.  Except for deviations from GAAP in accordance with recent past practice and as otherwise disclosed in writing to Lender, maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements**.  Furnish Lender with the following:

**Annual Statements**.  As soon as available, but in no event later than one-hundred-twenty (120) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, compiled by a certified public accountant satisfactory to Lender.

**Quarterly Statements**.  As soon as available, but in no event later than 45 days after the end of each fiscal quarter, Borrower's balance sheet and profit and loss statement for the fiscal quarter then ended, prepared by Borrower.

**Monthly Statements**.  As soon as available but in no event later than 30 days after the end of each calendar month, Borrower's balance sheet and profit and loss statement for the calendar month then ended, prepared by Borrower.

**Additional Requirements**.  **Basis of Financial Statements**.   The financial statements required by this Agreement shall be prepared on a consolidated basis.

\10970471.10

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

**Loan No:  [_____]**                                                        **Page 10**

**Compliance Certificates**. Concurrently with the delivery of each of the financial statements referred to above, a duly completed Compliance Certificate signed by a responsible officer of the Borrower.

**Collateral Schedules**.  Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender schedules of Accounts Receivable Agings Reports in form and substance satisfactory to the Lender. Thereafter supplemental schedules shall be delivered according to the following schedule:   With respect to Eligible Accounts, schedules shall be delivered monthly within 15 days after monthly reporting period.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional information**. Furnish such additional information and statements, as Lender may request from time to time.

**Insurance**.  Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender.  Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person.  In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsement.

**Insurance Reports**.  Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following:  (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy.  In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral.  The cost of such appraisal shall be paid by Borrower.

**Other Agreements**.  Comply with all terms and conditions of the Borrowing Order and all other orders of the Bankruptcy Court and, to the extent not prohibited by any such Bankruptcy Court order, comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify

**DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Loan No: [_____]                                                              **Page 11**

Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds as specified in the Use of Proceeds sub-section of the Bankruptcy Case section of this Agreement, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel: conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine

\10970471.10

**DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Loan No: [_____]                                                    Page 12

or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Compliance with Borrowing Order.** The Borrower shall promptly, punctually and faithfully perform all and singular the terms and conditions of any Borrowing Order that may be in effect from time to time.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will not:

**Bankruptcy Consents.** Consent to or permit to exist (a) any modification, stay, vacation or amendment of the Borrowing Order without the Lender's prior written consent; (b) a priority claim or administrative expense claim or unsecured claim, whether now existing or hereafter arising, against Borrower or any subsidiary, including, without limitation, any such claim under any provision of the Bankruptcy Code, equal to or superior to the priority claim of the Lender in respect of the Obligations; (c) other than expressly provided in the Borrowing Order, any lien or other encumbrance upon any Collateral having a priority equal to or superior to the lien securing the Obligations, other than Permitted Encumbrances; (d) any order authorizing or directing the return of any of the Collateral pursuant to any provision of the Bankruptcy Code; (e) any order authorizing or directing the payment of any indebtedness or other obligations of the Borrower or any

\10970471.10

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

Loan No: [_____]                                                      Page 13

of its subsidiaries (other than the Pre-Petition Liabilities and indebtedness approved by the Lender in its sole discretion) incurred prior to the Petition Date or the grant of "adequate protection" (whether in cash or property) with respect to any indebtedness or similar obligations secured by a lien or other encumbrance; and (f) any order seeking authority to take any action that is prohibited by the terms of this Agreement or any Related Document or refrain from taking any action required to be taken by the terms hereof or thereof.

**LENDER'S EXPENDITURES.**  If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower or any subsidiary thereof fails to comply with any provision of this Agreement or any Related Documents to which it is a party, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral.  All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower.  All such expenses will become a part of the indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**CESSATION OF ADVANCES.**  If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any subsidiary of Borrower or any other Guarantor, or in the value of any Collateral securing any Loan; or (C) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (D) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.**  To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account).  This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future.  However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.  Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

\10970471.10

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

**Loan No: [_____]**                                            **Page 14**

**DEFAULT**.  Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default**.  Borrower fails to make any payment when due under the Loan.

**Other Defaults**.  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents, or any "Event of Default" shall occur under any Related Document.

**False Statements**.  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization**.  This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Events Affecting Guarantor**.  Any of the preceding events occurs with respect to any subsidiary or other Guarantor of any of the indebtedness or any subsidiary or other Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the indebtedness.

**Change in Ownership**.  Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change**.  The Borrower or any material subsidiary of the Borrower shall take any action to suspend the operation of its business in the ordinary course, liquidate all or a material portion of its assets, or employ a third party to conduct a program of closings or liquidations of a material part of its business without the prior written consent of Lender, or a material adverse change occurs in Borrower's financial condition or in the financial condition of its subsidiaries, taken as a whole, or Lender believes the prospect of payment or performance of the Loan is impaired, including, without limitation, as a result of any relief from automatic stay or other action of the Bankruptcy Court.

**Invalidity of Loan Documents**.  Any provision of this Agreement or any Related Document, at any time after its execution and delivery and for any reason other than satisfaction in full of the Obligations, ceases to be in full force and effect; or any of the Borrower, any of its subsidiaries or any creditors' committee established in connection with the Bankruptcy Case (a "Creditors' Committee") or any other person or entity with requisite standing contests in any manner the validity or enforceability of any material provision of this Agreement or any Related Document; or the Borrower or any of its subsidiaries deny any further obligation under this Agreement or the Related Documents to which it is a party, or purports to revoke, terminate or rescind any provision of this Agreement or any Related Document or seeks to avoid, limit or otherwise adversely

\10970471.10

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

**Loan No: [_____]**                                                                 **Page 15**

effect any lien upon the Collateral in favor of Lender; or any lien purported to be created hereunder or under any Related Document for the benefit of the Lender shall cease to be, or shall be asserted by Borrower, any of its subsidiaries, the Creditors' Committee or any other person or entity with requisite standing not to be a valid and perfected lien upon the Collateral, with the priority required by this Agreement or such Related Document.

**Appointment of Trustee; Conversion.** Either the appointment in the Bankruptcy Case of a trustee or any examiner having expanded powers to operate all or any part of the business of the Borrower or its subsidiaries, or the conversion of the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code.

**Relief from Automatic Stay.** The entry of any order that provides relief from the automatic stay otherwise imposed under the Bankruptcy Code that permits any creditor to realize upon, or exercise any right or remedy with respect to, all or any of the Collateral.

**Challenge to Liens.** The Creditors' Committee or any other person or entity with requisite standing challenges the validity, perfection, priority or enforceability of the Pre-Petition Liabilities or any lien or encumbrance granted with respect to the Pre-Petition Loans or with respect to this Agreement or any Related Document, or any such liens or encumbrances are determined to be null and void, invalid or unenforceable by the Bankruptcy Court or any other court of competent jurisdiction.

**Super-Priority Claims.** The filing of any application by the Borrower or any of its subsidiaries without the prior written consent of Lender for the approval of any super-priority claim in the Bankruptcy Case that is pari passu or senior to the priority of the claims of the Lender for the Obligations, or any such super-priority claim shall arise under the Bankruptcy Code.

**Plan of Reorganization.** Filing of a motion by Borrower or any of its subsidiaries or entry of an order confirming any plan or reorganization that does not require repayment in full in cash of all Obligations and Pre-Petition Liabilities on the effective date of such plan of reorganization.

**Other Filings.** Filing of a motion by Borrower or any of its subsidiaries or entry of an order in the Bankruptcy Court (a) permitting working capital or other financing (other ordinary course trade credit and unsecured debt) for Borrower or any subsidiary from any credit provider other than Lender without Lender's prior written consent in its sole discretion or (b) dismissing the Bankruptcy Case.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all sums owing in connection with the Loans, including

\10970471.10

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

Loan No: [_____]                                                    Page 16

all principal, interest, and all other fees, costs and charges, if any, will become immediately due and payable, all without nonce of any kind to Borrower. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise, including liquidating the Collateral in such manner as the Lender may require. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**COUNTERPARTS.** This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**AGREEMENTS CUMULATIVE.** This Agreement is intended to be cumulative of all other loan agreements between the parties. The terms stated in this Agreement are in addition to, and do not supersede, the terms of any other loan agreement which is applicable to any extension of credit by Lender to Borrower.

**FINAL AGREEMENT. BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.**

**ALL PROVISIONS OF THIS LOAN AGREEMENT AND THE NOTE ARE SUBJECT TO BANKRUPTCY COURT APPROVAL AND WILL NOT BECOME EFFECTIVE UNTIL SUCH APPROVAL HAS BEEN OBTAINED. THEREAFTER, ALL SUCH PROVISIONS SHALL REMAIN SUBJECT TO THE REQUIREMENTS AND RESTRICTIONS OF THE BANKRUPTCY COURT.**

**ADDRESS FOR NOTICES.** Notwithstanding anything to the contrary herein, all notices and communications to the Lender shall be directed to the following address:

Bank of America, N.A.
Charlotte CCS, Attn: Notice Desk

\10970471.10

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

Loan No: [_____]                                                    Page 17

---

200 South College, 13th Floor
Charlotte, NC 28255

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this
Agreement:

**Amendments.** This Agreement, together with any applicable Related Documents,
constitutes the entire understanding and agreement of the parties as to the matters set
forth in this Agreement. No alteration of or amendment to this Agreement shall be
effective unless given in writing and signed by the party or parties sought to be charged
or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees that if Lender hires an attorney to help
enforce this Agreement, Borrower will pay, subject to any limits under applicable law,
Lender's attorneys' fees and all of Lender's other collection expenses, whether or not
there is a lawsuit and including without limitation additional legal expenses for
bankruptcy proceedings.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes
only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or
transfer, whether now or later, of one or more participation interests in the Loan to one or
more purchasers, whether related or unrelated to Lender. Lender may provide, without
any limitation whatsoever, to any one or more purchasers, or potential purchasers, any
information or knowledge Lender may have about Borrower or about any other matter
relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may
have with respect to such matters. Borrower additionally waives any and all notices of
sale of participation interests, as well as all notices of any repurchase of such
participation interests. Borrower also agrees that the purchasers of any such participation
interests will be considered as the absolute owners of such interests in the Loan and will
have all the rights granted under the participation agreement or agreements governing the
sale of such participation interests. Borrower further waives all rights of offset or
counterclaim that it may have now or later against Lender or against any purchaser of
such a participation interest and unconditionally agrees that either Lender or such
purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or
insolvency of any holder of any interest in the Loan. Borrower further agrees that the
purchaser of any such participation interests may enforce its interests irrespective of any
personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender
and, to the extent not preempted by federal law, the laws of the Commonwealth of
Virginia without regard to its conflicts of law provisions. This Agreement has been
accepted by Lender in the Commonwealth of Virginia.

\10970471.10

**DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Loan No: [_____]                                                      Page 18

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the applicable Courts for the City of Richmond, Commonwealth of Virginia.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such convent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, if hand delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

**Loan No:  [_____]**                                                        **Page 19**

---

circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.**  All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.**  Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Obligations shall be paid in full in cash and performed in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.**  Time is of the essence in the performance of this Agreement.

**Waive Jury.**  All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Release.**  Borrower, for itself and each of its subsidiaries, hereby acknowledges and agrees that: (i) Lender, its affiliates, employees, officers, agents, contractors and attorneys-in-fact have acted in good faith in negotiating and entering into this Agreement and that the provisions hereof are not in breach or violation of any duty or obligation, express or implied, of Lender to Borrower or its subsidiaries; (ii) Lender, its affiliates, employees, officers, agents, contractors and attorneys-in-fact have fully performed all of their express and implied obligations to Borrower and its subsidiaries in connection with the Pre-Petition Loan, the Pre-Petition Liabilities, this Agreement and the Related Documents and with respect to all other loan and contractual relationships between Lender, on the one hand, and Borrower and/or any of its subsidiaries, on the other hand; and (iii) Borrower has no existing defense, counterclaim, offset, cross-complaint, claim, demand or cause of action against Lender or its affiliates, employees, officers, agents, contractors or attorneys-in-fact of any nature, whether in tort or in contract.   In consideration for the execution of this Agreement, Borrower, on its own behalf and on behalf of its subsidiaries, does hereby release and forever discharge Lender and Lender's affiliates, agents, employees, officers, contractors and attorneys-in-fact from any and all actions, causes of action, debts, dues, claims, demands, liabilities and obligations of every kind and nature, both in law and in equity, known or unknown, now existing, which

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

**Loan No: [_____]**                                                    **Page 20**

might be asserted against Lender arising out of, based upon, or associated with any action taken or not taken by Lender from the beginning of time to the date of this Agreement. The provisions of this paragraph shall survive the repayment of the Pre-Petition Liabilities, the Obligations and the Loans and the termination of this Agreement or all or any of the Related Documents, and any other document or instrument entered into in connection with any of the foregoing.

**Bankruptcy Court Orders.**   All parties to this Agreement acknowledge that this Agreement shall in all respects be subject to the orders of the Bankruptcy Court.

**DEFINITIONS.**  The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Account.**   The word "Account' means a trade account, account receivable, other receivable, or other right to payment for goods sold or services rendered owing to Borrower (or to a third party grantor acceptable to Lender).

**Advance.**   The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement.

**Agreement.**   The word "Agreement" means this Business Loan Agreement (Asset Based), as this Business Loan Agreement (Asset Based) may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement (Asset Based) from time to time.

**Borrower.**   The word "Borrower" means MMR Holdings Inc. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Borrowing Base**.  The words "Borrowing Base" mean, as determined by Lender from time to time, the lesser of (1) the Revolving Commitments or (2) 80.000% of the aggregate amount of Eligible Accounts.

**Business Day.**  The words "Business Day" mean a day on which commercial banks are open in the Commonwealth of Virginia.

\10970471.10

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

**Loan No:** [_____]                                                   **Page 21**

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise. The word Collateral also includes without limitation all collateral described in the Collateral section of this Agreement.

**Eligible Accounts.** The words "Eligible Accounts" mean at any time, all of Borrower's Accounts which contain selling terms and conditions acceptable to Lender. The net amount of any Eligible Account against which Borrower may borrow shall exclude all returns, discounts, credits, and offsets of any nature. Unless otherwise agreed to by Lender in writing, Eligible Accounts do not include:

(1) Accounts with respect to which the Account Debtor is employee or agent of Borrower.

(2) Accounts with respect to which the Account Debtor is a subsidiary of, or affiliated with Borrower or its shareholders, officers, or directors.

(3) Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional.

(4) Accounts with respect to which Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to Borrower.

(5) Accounts which are subject to dispute, counterclaim, or setoff.

(6) Accounts with respect to which the goods have not been shipped or delivered, or the services have not been rendered, to the Account Debtor.

(7) Accounts with respect to which Lender, in its sole discretion, deems the creditworthiness or financial condition of the Account Debtor to be unsatisfactory.

(8) Accounts of any Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts; or who has had appointed a trustee, custodian, or receiver for the assets of such Account Debtor;

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

Loan No: [_____]                                                    **Page 22**

or who has made an assignment for the benefit of creditors or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due.

(9) Accounts outstanding for 90 days or more past the date of issuance thereof.

(10)   Notwithstanding anything herein to the contrary, 50% of all otherwise Eligible Accounts shall be deemed ineligible.

**Environmental Laws.**  The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 4.2 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.**  The words "Event of Default' mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Expiration Date.**  The words "Expiration Date" mean the date of termination of Lender's commitment to lend under this Agreement.

**GAAP.**  The word "GAPP" means generally accepted accounting principles.

**Grantor.**  The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, and their personal representatives, successors and assigns.

**Guarantor.**  The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Obligations.

**Guaranty.**   The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.**  The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental

**DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Loan No: [_____]                                                    **Page 23**

Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower or Grantor or any other borrower, guarantor, pledgor, obligor or accommodation party is responsible under this Agreement or under any of the Related Documents, including any obligations arising under any interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, securities puts, calls, collars, options or forwards or any combination of, or option with respect to, these or similar transactions now or hereafter entered into between any such party and Lender or any affiliate of Lender.

**Lender.** The word "Lender" means Bank of America, N.A., its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Revolving Note executed by MMR Holdings Inc. in the principal amount of $400,000.00 dated as of the date of this Agreement, together with all modifications of and renewals, replacements, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" means Liens pursuant to the Pre-Petition Loan or otherwise in favor of Lender.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Revolving Commitments.**    The words "Revolving Commitments" mean the commitments set forth below with respect to the period indicated in the following grid:

| Period: | Revolving Commitments |
|---|---|
| Closing Date – June 29, 2010 | $400,000 |
| June 30, 2010 – September 29, 2010 | $350,000 |

\10970471.10

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

Loan No: [_____]                                                    Page 24

| September 30, 2010 – December 31, 2010 | $300,000 |
|---|---|

**Security Agreement**. The words "Security Agreement" mean the Security Agreement dated as of the date hereof by the Borrower and the Guarantors to the Lender, as such may be amended from time to time.

**Security Interest**. The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS AGREEMENT IS DATED APRIL [__], 2010.**

**THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

**BORROWER:**

**MMR HOLDINGS INC.**

By:_____(Seal)
    Neil Burgess, CEO of MMR Holdings Inc.

**LENDER:**

**BANK OF AMERICA, N.A.**

By:_____(Seal)
    Authorized Signer

\10970471.10

## DEBTOR-IN-POSSESSION LOAN AGREEMENT (ASSET BASED)
### (Continued)

Loan No:  [_____]                                                    Page 24

| September 30, 2010 – December 31, 2010 | $300,000 |
|---|---|

**Security Agreement.** The words "Security Agreement" mean the Security Agreement dated as of the date hereof by the Borrower and the Guarantors to the Lender, as such may be amended from time to time.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT AND BORROWER AGREES TO ITS TERMS.  THIS AGREEMENT IS DATED APRIL [__], 2010.**

**THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

**BORROWER:**

**MMR HOLDINGS INC.**

By:_____(Seal)
    Neil Burgess, CEO of MMR Holdings Inc.


**LENDER:**

**BANK OF AMERICA, N.A.**

By:_____(Seal)
    Authorized Signer

SCHEDULE 1

FINANCIAL INFORMATION

- Bankruptcy Case and claims arising therefrom.
- Hitachi Litigation and Garnishment Order, which has severely impaired access to working capital.
- Borrower has continued to see its results of operations adversely affected by general economic conditions and conditions in the medical imaging industry.

\10970471.10

SCHEDULE 2

EXISTING SECURITY INTERESTS

DEBTORS- MMR HOLDINGS, INC. et al.

UCC Search Results
March, 2010

| | Debtor | Secured Party | Jurisdiction | Filing Type | Filing Date | Filing No. | Searching Time Frame | Collateral Description |
|---|---|---|---|---|---|---|---|---|
| **MMR HOLDINGS, INC.** | | | | | | | | |
| 1 | MMR Holdings, Inc. | Bank of America, N.A. | VA-STATE | UCC-1 | 12-6-99 | 991206 7154 | 5 years thru 3-25-10 | Any and all accounts |
| | | Bank of America, N.A. | VA-STATE | CONT | 9-16-04 | 040916 7204-8 | 5 years thru 3-25-10 | Continuation of 9912067154 |
| | | Bank of America, N.A. | VA-STATE | CONT | 6-18-09 | 090618 7121-0 | 5 years thru 3-25-10 | Continuation of 9912067154 |
| 2 | | Bank of America, N.A. | VA-STATE | UCC-1 | 8-30-00 | 000803 7208 | 5 years thru 3-25-10 | Accounts, Inventory, Equipment and Gen. Intang. |
| | | Bank of America, N.A. | VA-STATE | CONT | 7-22-05 | 050722 7228-9 | 5 years thru 3-25-10 | Continuation of 000803 7208 |
| | | Bank of America, N.A. | VA-STATE | CONT | 2-11-10 | 100211 7095-4 | 5 years thru 3-25-10 | Continuation of 000803 7208 |
| 3 | | Bank of America, N.A. | VA-STATE | UCC-1 | 1-22-10 | 100122 7167-8 | 5 years thru 3-25-10 | Any and all accounts |
| | | | VA-STATE | | | | 10 years thru 3-25-10 | **FED TAX LIENS – No records found** |
| **OPENSIDED MRI OF ATLANTA, LLC** | | | | | | | | |
| 1 | OpenSided MRI of Atlanta, LLC | Banc of America Leasing & Capital, L.L.C. | VA-STATE | UCC-1 | 12-20-01 | 011220 7128 | 5 years thru 3-25-10 | Specific equipment |

\l0970471.10

| Debtor | Secured Party | Jurisdiction | Filing Type | Filing Date | Filing No. | Searching Time Frame | Collateral Description |
|---|---|---|---|---|---|---|---|
| | Banc of America Leasing & Capital, L.L.C. | VA-STATE | CONT | 11-20-06 | 061120 7156-3 | 5 years thru 3-25-10 | Continuation of 011220 7128 |
| 2 | Bank of America, N.A. | VA-STATE | UCC-1 | 1-22-10 | 100122 7168-0 | 5 years thru 3-25-10 | Any and all accounts |
| | | VA-STATE | | | | 10 years thru 3-25-10 | FED TAX LIENS – No records found |
| **OPENSIDED MRI OF CINCINNATI, LLC** | | | | | | | |
| 1 OpenSided MRI of Cincinnati, LLC | CIT Healthcare, LLC | VA-STATE | UCC-1 | 5-2-06 | 060502 7120-7 | | All assets, including Accounts Receivable |
| 2 | Bank of America, N.A. | VA-STATE | UCC-1 | 1-22-10 | 100122 7175-5 | 5 years thru 3-25-10 | Any and all accounts |
| **OPENSIDED MRI OF CLEVELAND, LLC** | | | | | | | |
| 1 OpenSided MRI of Cleveland, L.L.C. | Hitachi Capital America Corp. | VA-STATE | UCC-1 | 5-17-06 | 060517 7167-6 | 5 years thru 3-25-10 | Specific equipment |
| 2 OpenSided MRI of Cleveland, L.L.C. | Hitachi Capital America Corp. | VA-STATE | UCC-1 | 5-17-06 | 060517 7168-8 | 5 years thru 3-25-10 | Equipment, goods and inventory of Debtor and future equipment, furniture, fixtures, motor vehicles etc and articles of tangible personal property. |
| 3 OpenSided MRI of Cleveland, LLC | Bank of America, N.A. | VA-STATE | UCC-1 | 1-22-10 | 100122 176-7 | 5 years thru 3-25-10 | Any and all accounts |
| | | VA-STATE | | | | 10 years thru 3-25-10 | FED TAX LIENS – No records found |
| **OPENSIDED MRI OF DENVER, LLC** | | | | | | | |
| 1 OPENSIDED MRI OF DENVER, L.L.C. | Hitachi Capital America Corp. | VA-STATE | UCC-1 | 5-17-06 | 060517 7166-4 | 5 years thru 3-25-10 | Specific equipment |
| 2 OPENSIDED MRI OF DENVER, L.L.C. | Hitachi Capital America Corp. | VA-STATE | UCC-1 | 5-17-06 | 060517 7164-0 | 5 years thru 3-25-10 | Equipment, goods and inventory of Debtor and future equipment, furniture, fixtures, motor vehicles etc and articles of tangible personal property. |
| 3 OpenSided MRI of Denver, LLC | Bank of America, N.A. | VA-STATE | UCC-1 | 1-22-10 | 100122 7177-9 | 5 years thru 3-25-10 | Any and all accounts |

\\0970471.10

| | Debtor | Secured Party | Jurisdiction | Filing Type | Filing Date | Filing No. | Searching Time Frame | Collateral Description |
|---|---|---|---|---|---|---|---|---|
| | | | VA-STATE | | | | 10 years thru 3-25-10 | FED TAX LIENS – No records found |
| **OPENSIDED MRI OF KANSAS, LLC** | | | | | | | | |
| 1 | OpenSided MRI of Kansas, L.L.C. | General Elec Company | VA-STATE | UCC-1 | 5-15-05 | | 5 years thru 3-25-10 | Specific equipment |
| 2 | OPENSIDED MRI OF KANSAS, L.L.C. | Hitachi Capital America Corp. | VA-STATE | UCC-1 | 5-17-06 | 060517 7163-8 | 5 years thru 3-25-10 | Specific equipment |
| 3 | OPENSIDED MRI OF KANSAS, L.L.C. | Hitachi Capital America Corp. | VA-STATE | UCC-1 | 5-17-06 | 060517 7165-2 | 5 years thru 3-25-10 | Equipment, goods and inventory of Debtor and future equipment, furniture, fixtures, motor vehicles etc and articles of tangible personal property. |
| 4 | OpenSided MRI of Kansas, LLC | Bank of America, N.A. | VA-STATE | UCC-1 | 1-22-10 | 100122 7179-3 | 5 years thru 3-25-10 | Any and all accounts |
| | | | VA-STATE | | | | 10 years thru 3-25-10 | FED TAX LIENS – No records found |
| **OPENSIDED MRI OF LAS VEGAS, LLC** | | | | | | | | |
| 1 | Open Sided MRI of Las Vegas, L.L.C. | Gen. Elec. Capital Corp. | VA-STATE | UCC-1 | 6-11-03 | 030611 7205-2 | 5 years thru 3-25-10 | Specific equipment |
| | Open Sided MRI of Las Vegas, L.L.C. | Gen. Elec. Capital Corp. | VA-STATE | CONT | 2-11-08 | 080211 7028-8 | 5 years thru 3-25-10 | Continuation of 0 30611 7205-2 |
| 2 | Open Sided MRI of Las Vegas, L.L.C. | Gen. Elec. Capital Corp. | VA-STATE | UCC-1 | 6-11-03 | 030611 7206-4 | 5 years thru 3-25-10 | Specific equipment |
| | Open Sided MRI of Las Vegas, L.L.C. | Gen. Elec. Capital Corp. | VA-STATE | CONT | 2-11-08 | 080211 7029-0 | 5 years thru 3-25-10 | Continuation of 030611 7206-4 |
| 3 | Open Sided MRI of Las Vegas, L.L.C. | Gen. Elec. Capital Corp. | VA-STATE | UCC-1 | 6-11-03 | 030611 7207-6 | 5 years thru 3-25-10 | Specific equipment |
| | Open Sided MRI of Las Vegas, L.L.C. | Gen. Elec. Capital Corp. | VA-STATE | CONT | 2-11-08 | 080211 7027-6 | 5 years thru 3-25-10 | Continuation of 030611 7207-6 |
| 4 | Open Sided MRI of Las Vegas, L.L.C. | Gen. Elec. Capital Corp. | VA-STATE | UCC-1 | 7-3-03 | 030730 7301-8 | 5 years thru 3-25-10 | Blanket lien |
| | Open Sided MRI of Las Vegas, L.L.C. | Gen. Elec. Capital Corp. | VA-STATE | CONT | 3-11-08 | 080311 7156-1 | 5 years thru 3-25-10 | Continuation of 030730 7301-8 |
| 5 | OPEN SIDED MRI OF LAS VEGAS L.L.C. | Hitachi Capital America Corp. | VA-STATE | UCC-1 | 5-17-06 | 060517 7167-6 | 5 years thru 3-25-10 | Specific equipment |

\\0970471.10

| | Debtor | Secured Party | Jurisdiction | Filing Type | Filing Date | Filing No. | Searching Time Frame | Collateral Description |
|---|---|---|---|---|---|---|---|---|
| 6 | OPEN SIDED MRI OF LAS VEGAS L.L.C. | Hitachi Capital America Corp. | VA-STATE | UCC-1 | 5-17-06 | 060517 7168-8 | 5 years thru 3-25-10 | Equipment, goods and inventory of Debtor and future equipment, furniture, fixtures, motor vehicles etc and articles of tangible personal property. |
| 7 | Open Sided MRI of Las Vegas, LLC | Bank of America, N.A. | VA-STATE | UCC-1 | 1-22-10 | 100122 176-7 | 5 years thru 3-25-10 | Any and all accounts |
| | | | VA-STATE | | | | 10 years thru 3-25-10 | FED TAX LIENS – No records found |
| **OPENSIDED MRI OF LOUISVILLE, LLC** | | | | | | | | |
| 1 | OPENSIDED MRI OF LOUISVILLE, L.L.C. | Hitachi Capital America Corp. | VA-STATE | UCC-1 | 5-17-06 | 060517 7162-6 | 5 years thru 3-25-10 | Specific equipment |
| 2 | OPENSIDED MRI OF LOUISVILLE, L.L.C. | Hitachi Capital America Corp. | VA-STATE | UCC-1 | 5-17-06 | 060517 7159-9 | 5 years thru 3-25-10 | Equipment, goods and inventory of Debtor and future equipment, furniture, fixtures, motor vehicles etc and articles of tangible personal property. |
| 3 | OpenSided MRI of Louisville, LLC | Bank of America, N.A. | VA-STATE | UCC-1 | 1-22-10 | 100122 7169-2 | 5 years thru 3-25-10 | Any and all accounts |
| | | | VA-STATE | | | | 10 years thru 3-25-10 | FED TAX LIENS – No records found |
| **OPENSIDED MRI OF NEW ORLEANS, LLC** | | | | | | | | |
| 1 | OPENSIDED MRI OF NEW ORLEANS, LLC | Leaf Funding, Inc. | VA-STATE | UCC-1 | 9-22-06 | 060922 7282-9 | 5 years thru 3-25-10 | Specific equipment |
| 2 | OPENSIDED MRI OF NEW ORLEANS, L.L.C. | IBM Credit LLC | VA-STATE | UCC-1 | 1-3-07 | 070103 7052-8 | 5 years thru 3-25-10 | Specific equipment |
| 3 | OpenSided MRI of New Orleans, LLC | Bank of America, N.A. | VA-STATE | UCC-1 | 1-22-10 | 100122 7173-1 | 5 years thru 3-25-10 | Any and all accounts |
| | | | VA-STATE | | | | 10 years thru 3-25-10 | FED TAX LIENS – No records found |
| **OPENSIDED MRI OF OKLAHOMA CITY, LLC** | | | | | | | | |
| 1 | OPENSIDED MRI OF OKLAHOMA CITY, | Hitachi Capital America Corp. | VA-STATE | UCC-1 | 5-17-06 | 060517 7160-2 | 5 years thru 3-25-10 | Specific equipment |

\10970471.10

| | Debtor | Secured Party | Jurisdiction | Filing Type | Filing Date | Filing No. | Searching Time Frame | Collateral Description |
|---|---|---|---|---|---|---|---|---|
| | L.L.C. | | | | | | | |
| 2 | OPENSIDED MRI OF OKLAHOMA CITY, L.L.C. | Hitachi Capital America Corp. | VA-STATE | UCC-1 | 5-17-06 | 060517 7161-4 | 5 years thru 3-25-10 | Equipment, goods and inventory of Debtor and future equipment, furniture, fixtures, motor vehicles etc and articles of tangible personal property. |
| 3 | OpenSided MRI of Oklahoma City, LLC | Bank of America, N.A. | VA-STATE | UCC-1 | 1-22-10 | 100122 7174-3 | 5 years thru 3-25-10 | Any and all accounts |
| | | | VA-STATE | | | | 10 years thru 3-25-10 | FED TAX LIENS – No records found |
| **OPENSIDED MRI OF ORANGE COUNTY, LLC** | | | | | | | | |
| 1 | OpenSided MRI of Orange County, L.L.C. | Banc of America Leasing & Capital, LLC | VA-STATE | UCC-1 | 12-20-01 | 011220 7129 | 5 years thru 3-25-10 | Specific equipment |
| | OpenSided MRI of Orange County, L.L.C. | Banc of America Leasing & Capital, LLC | VA-STATE | CONT | 11-20-06 | 061120 7155-1 | 5 years thru 3-25-10 | Continuation of 011220 7129 |
| 2 | OPENSIDED MRI OF ORANGE COUNTY, LLC | Toshiba America Medical Credit | VA-STATE | UCC-1 | 3-15-06 | 060315 7002-0 | 5 years thru 3-25-10 | **NOTE:** State has no copy of this UCC on file |
| 3 | OpenSided MRI of Orange County, L.L.C. | CIT Healthcare LLC | VA-STATE | UCC-1 | 5-2-06 | 060502 7121-0 | 5 years thru 3-25-10 | Blanket |
| 4 | OpenSided MRI of Orange County, LLC | Bank of America, N.A. | VA-STATE | UCC-1 | 1-22-10 | 100122 7171-7 | 5 years thru 3-25-10 | Any and all accounts |
| | | | VA-STATE | | | | 10 years thru 3-25-10 | FED TAX LIENS – No records found |
| **OPENSIDED MRI OF SAN ANTONIO, LLC** | | | | | | | | |
| 1 | OPENSIDED MRI OF SAN ANTONIO, L.L.C. | Hitachi Capital America Corp. | VA-STATE | UCC-1 | 5-17-06 | 060517 7170-3 | 5 years thru 3-25-10 | Specific equipment |
| 2 | OPENSIDED MRI OF SAN ANTONIO, L.L.C. | Hitachi Capital America Corp. | VA-STATE | UCC-1 | 5-17-06 | 060517 7169-0 | 5 years thru 3-25-10 | Equipment, goods and inventory of Debtor and future equipment, furniture, fixtures, motor vehicles etc and articles of tangible personal property. |
| 3 | OpenSided MRI of San Antonio, LLC | Bank of America, N.A. | VA-STATE | UCC-1 | 1-22-10 | 100122 7172-9 | 5 years thru 3-25-10 | Any and all accounts |

\1097047I.10

| | Debtor | Secured Party | Jurisdiction | Filing Type | Filing Date | Filing No. | Searching Time Frame | Collateral Description |
|---|---|---|---|---|---|---|---|---|
| | | | VA-STATE | | | | 10 years thru 3-25-10 | **FED TAX LIENS – No records found** |
| **OPENSIDED MRI, LLC** | | | | | | | | |
| 1 | OpenSided MRI, L.L.C. | Banc of America Leasing & Capital, L.L.C. | VA-STATE | UCC-1 | 12-20-01 | 011220 7131 | 5 years thru 3-25-10 | Specific equipment |
| | OpenSided MRI, L.L.C. | Banc of America Leasing & Capital, L.L.C. | VA-STATE | CONT | 11-20-06 | 061120 7154-9 | 5 years thru 3-25-10 | Continuation of 011220 7131 |
| 2 | Open-Sided MRI, L.L.C. | Gen.Elec. Capital Corp. | VA-STATE | UCC-1 | 4-18-05 | 050418 7554-5 | 5 years thru 3-25-10 | Specific equipment |
| 3 | Open-Sided MRI, L.L.C | Gen.Elec. Capital Corp. | VA-STATE | UCC-1 | 4-18-05 | 050418 7557-1 | 5 years thru 3-25-10 | Specific equipment |
| 4 | OpenSided MRI, LLC | Bank of America, N.A. | VA-STATE | UCC-1 | 1-22-10 | 100122 7178-1 | 5 years thru 3-25-10 | |
| | | | VA-STATE | | | | 10 years thru 3-25-10 | **FED TAX LIENS – No records found** |

\10970471.10

\10970471.10

Execution Version

**CLOSING DATE**
**COMPLIANCE CERTIFICATE**

**MMR HOLDINGS, INC.**

April 14, 2010

This Compliance Certificate is delivered pursuant to that certain Debtor-In-Possession Loan Agreement (Asset Based), dated as of April 14, 2010 (the "*Agreement*"), by and between **MMR HOLDINGS INC.**, a Virginia corporation (the "*Borrower*") and **BANK OF AMERICA, N.A.**, a national banking association the "*Lender*"). Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned such terms in the Agreement.

Pursuant to the Agreement, the undersigned officer of Borrower hereby certifies to Lender as follows:

1.  The undersigned officer has personal knowledge of the information set forth herein;

2.  This Compliance Certificate is delivered concurrently with the Closing Date;

3.  To the best of Borrower's knowledge after reasonably diligent investigation, no condition exists that constitutes or, with the passage of time or giving of notice or both, would constitute an Event of Default under the Agreement or under any Related Document;

4.  The representations and warranties set forth in the Agreement, in the Related Documents, and in any document or certificate delivered to Lender under the Agreement are true and correct in all material respects, other than those representations and warranties that are qualified as to materiality, which representations and warranties are true and correct in all respects; and

5.  As of the date hereof, the aggregate outstanding principal amount of Advances is less than or equal to the lesser of the (i) Revolving Commitments and (ii) the Borrowing Base.

**IN WITNESS WHEREOF,** the undersigned authorized officer of the Borrower has executed this Compliance Certificate on behalf of the Borrower as of the date first above written.

**MMR HOLDINGS INC.**

By: _____

Name: _Neil Burgell_

Title: _CEO_

**IN WITNESS WHEREOF**, the undersigned authorized officer of the Borrower has executed this Compliance Certificate on behalf of the Borrower as of the date first above written.

**MMR HOLDINGS INC.**

By:_____

Name:_____

Title:_____

\11100699.4

Execution Version

**Bank of America** ⟫

CONTINUING AND UNCONDITIONAL GUARANTY

To:     Bank of America, N.A.

1. <u>The Guaranty</u>. For valuable consideration, the undersigned ("Guarantor") hereby unconditionally guarantees and promises to pay promptly to Bank of America, N.A., its subsidiaries and affiliates (collectively, "Bank"), or order, in lawful money of the United States, any and all Indebtedness of MMR Holdings Inc. ("Borrower") to Bank when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. The liability of Guarantor under this Guaranty is not limited as to the principal amount of the Indebtedness guaranteed and includes, without limitation, liability for all interest, fees, indemnities (including, without limitation, hazardous waste indemnities), and other costs and expenses relating to or arising out of the Indebtedness and for all Swap Obligations now or hereafter owing from Borrower to Bank. The liability of Guarantor is continuing and relates to any Indebtedness, including that arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied. This Guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor. If multiple individuals or entities sign this Guaranty, their obligations under this Guaranty shall be joint and several. If Guarantor is a subsidiary or affiliate of Borrower, Guarantor's liability hereunder shall not exceed at any one time the largest amount during the period commencing with Guarantor's execution of this Guaranty and thereafter that would not render Guarantor's obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code (Title 11, United States Code) or any comparable provisions of any applicable state law.

2. <u>Definitions</u>.

(a) "Bank Agreements" shall mean all agreements, documents, and instruments evidencing any of the Indebtedness, including but not limited to (i) that certain Debtor-In-Possession Loan Agreement (Asset Based) dated as of the date hereof, between Borrower and Bank; (ii) that certain Debtor-In-Possession Revolving Promissory Note dated as of the date hereof in favor of Bank in the original principal amount of $400,000,000; (iii) the Pre-Petition Liabilities (as defined in the loan agreement described in clause (i) above); (iv) all other loan agreements between Borrower and Bank and promissory notes from Borrower in favor of Bank; (v) that certain Security Agreement dated as of the date hereof, among Borrower, Guarantor and Bank; and (vi) all deeds of trust, mortgages, other security agreements, and other agreements, documents, and instruments executed by Borrower in connection with the Indebtedness, all as now in effect and as hereafter amended, restated, renewed, or superseded.

(b) "Borrower" shall mean the individual or the entity named in Paragraph 1 of this Guaranty and, if more than one, then any one or more of them.

(c) "Guarantor" shall mean any one or more of the entities signing this Guaranty.

(d) "Indebtedness" shall mean any and all debts, liabilities, and obligations of Borrower to Bank, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Bank by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Bank for its own account or as agent for another or others, whether Borrower may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, (i) that certain Debtor-In-Possession

Loan Agreement (Asset Based) dated as of the date hereof (as amended and/or modified) between Borrower and Bank; (ii) that certain Debtor-In-Possession Revolving Promissory Note dated as of the date hereof in favor of Bank in the original principal amount of $400,000,000; (iii) the Pre-Petition Liabilities (as defined in the loan agreement described in clause (i) above); (iv) any and all Swap Obligations; and (v) any and all obligations of Borrower to Bank for reasonable attorneys' fees and all other costs and expenses incurred by Bank in the collection or enforcement of any debts, liabilities, and obligations of Borrower to Bank.

(e) "Swap Obligations" shall mean all obligations of Borrower arising under any interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, securities puts, calls, collars, options or forwards or any combination of, or option with respect to, these or similar transactions now or hereafter entered into between Borrower and Bank.

3. <u>Obligations Independent</u>. The obligations hereunder are independent of the obligations of Borrower or any other guarantor, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions. Anyone executing this Guaranty shall be bound by its terms without regard to execution by anyone else.

4. <u>Rights of Bank</u>. Guarantor authorizes Bank, without notice or demand and without affecting its liability hereunder, from time to time to:

(a) renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon, or otherwise change the terms of any Bank Agreements;

(b) receive and hold security for the payment of this Guaranty or any Indebtedness and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security;

(c) apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine;

(d) release or substitute any Guarantor or any one or more of any endorsers or other guarantors of any of the Indebtedness; and

(e) permit the Indebtedness to exceed Guarantor's liability under this Guaranty, and Guarantor agrees that any amounts received by Bank from any source other than Guarantor shall be deemed to be applied first to any portion of the Indebtedness not guaranteed by Guarantor.

5. <u>Guaranty to be Absolute</u>. Guarantor agrees that until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner or to any extent vary the risks of Guarantor under this Guaranty or that, but for this paragraph, might discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty. Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Bank described in the immediately preceding paragraph of this Guaranty. It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional.

\11097692.4

6. <u>Guarantor's Waivers of Certain Rights and Certain Defenses</u>.  Guarantor waives:

(a)  any right to require Bank to proceed against Borrower, proceed against or exhaust any security for the Indebtedness, or pursue any other remedy in Bank's power whatsoever, including but not limited to the benefits of Virginia Code §49-25 and Virginia Code §49-26, as amended, or otherwise, or any similar statute;

(b)  any defense arising by reason of any disability or other defense of Borrower, or the cessation from any cause whatsoever of the liability of Borrower;

(c)  any defense based on any claim that Guarantor's obligations exceed or are more burdensome than those of Borrower; and

(d)  the benefit of any statute of limitations affecting Guarantor's liability hereunder.

No provision or waiver in this Guaranty shall be construed as limiting the generality of any other waiver contained in this Guaranty.

7. <u>Waiver of Subrogation</u>.  Until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, even though the Indebtedness may be in excess of Guarantor's liability hereunder, Guarantor waives to the extent permitted by applicable law any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise) including, without limitation, any claim or right of subrogation under the Bankruptcy Code (Title 11, United States Code) or any successor statute, arising from the existence or performance of this Guaranty, and Guarantor waives to the extent permitted by applicable law any right to enforce any remedy that Bank now has or may hereafter have against Borrower, and waives any benefit of, and any right to participate in, any security now or hereafter held by Bank.

8. <u>Waiver of Notices</u>.  Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of intent to accelerate, notices of acceleration, notices of any suit or any other action against Borrower or any other person, any other notices to any party liable on any Bank Agreement (including Guarantor), notices of acceptance of this Guaranty, notices of the existence, creation, or incurring of new or additional Indebtedness to which this Guaranty applies or any other Indebtedness of Borrower to Bank, and notices of any fact that might increase Guarantor's risk.

9. <u>Security</u>.  Guarantor's obligations hereunder are secured by that certain Security Agreement dated as of the date hereof (as amended and/or modified), among Borrower, Guarantor and Bank.

10. <u>Subordination</u>.  Any obligations of Borrower to Guarantor, now or hereafter existing, including but not limited to any obligations to Guarantor as subrogee of Bank or resulting from Guarantor's performance under this Guaranty, are hereby subordinated to the Indebtedness.  In addition to Guarantor's waiver of any right of subrogation as set forth in this Guaranty with respect to any obligations of Borrower to Guarantor as subrogee of Bank, Guarantor agrees that, if Bank so requests, Guarantor shall not demand, take, or receive from Borrower, by setoff or in any other manner, payment of any other obligations of Borrower to Guarantor until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated.  If any payments are received by Guarantor in violation of such waiver or agreement, such payments shall be received by Guarantor as trustee for Bank and shall be paid over to Bank on account of the Indebtedness, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.  Any security interest, lien, or other encumbrance that Guarantor may now or hereafter have on any property of Borrower is hereby subordinated to any security interest, lien, or other encumbrance that Bank may have on any such property.

\1 1097692.4

11. Revocation of Guaranty.

(a) This Guaranty may be revoked at any time by Guarantor in respect to future transactions. Such revocation shall be effective upon actual receipt by Bank, at the address shown below or at such other address as may have been provided to Guarantor by Bank, of written notice of revocation. Revocation shall not affect any of Guarantor's obligations or Bank's rights with respect to transactions committed or entered into prior to Bank's receipt of such notice, regardless of whether or not the Indebtedness related to such transactions, before or after revocation, has been incurred, renewed, compromised, extended, accelerated, or otherwise changed as to any of its terms, including time for payment or increase or decrease of the rate of interest thereon, and regardless of any other act or omission of Bank authorized hereunder. Revocation by Guarantor shall not affect any obligations of any other guarantor.

(b) In the event of the dissolution of any Guarantor or the combination or consolidation of any Guarantor into or with another entity, as to all surviving Guarantors, this Guaranty shall continue in full force and effect after such dissolution, combination or consolidation, not only as to the Indebtedness existing at that time, but also as to the Indebtedness thereafter incurred by Borrower to Bank.

(c) Guarantor acknowledges and agrees that this Guaranty may be revoked only in accordance with the foregoing provisions of this paragraph and shall not be revoked simply as a result of any change in name, location, or composition or structure of Borrower, the dissolution of Borrower, or the termination, increase, decrease, or other change of any personnel or owners of Borrower.

12. Reinstatement of Guaranty. If this Guaranty is revoked, returned, or canceled, and subsequently any payment or transfer of any interest in property by Borrower to Bank is rescinded or must be returned by Bank to Borrower, this Guaranty shall be reinstated with respect to any such payment or transfer, regardless of any such prior revocation, return, or cancellation.

13. Stay of Acceleration. In the event that acceleration of the time for payment of any of the Indebtedness is stayed upon the insolvency, bankruptcy, or reorganization of Borrower or otherwise, all such Indebtedness guaranteed by Guarantor shall nonetheless be payable by Guarantor immediately if requested by Bank.

14. Information Relating to Borrower. Guarantor acknowledges and agrees that it has made such independent examination, review, and investigation of the Bank Agreements as Guarantor deems necessary and appropriate, including, without limitation, any covenants pertaining to Guarantor contained therein, and shall have sole responsibility to obtain from Borrower any information required by Guarantor about any modifications thereto. Guarantor further acknowledges and agrees that it shall have the sole responsibility for, and has adequate means of, obtaining from Borrower such information concerning Borrower's financial condition or business operations as Guarantor may require, and that Bank has no duty, and Guarantor is not relying on Bank, at any time to disclose to Guarantor any information relating to the business operations or financial condition of Borrower.

15. Representations and Warranties. Guarantor represents and warrants to Bank that it is duly authorized to execute and deliver this Guaranty and to perform its obligations under this Guaranty; that this Guaranty has been duly executed and delivered on behalf of Guarantor by its duly authorized representatives; that this Guaranty is legal, valid, binding and enforceable against Guarantor in accordance with its terms except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles; and that Guarantor's execution, delivery and performance of this Guaranty do not violate or constitute a breach of any of its organizational documents, any agreement or instrument to which Guarantor is a party, or any law, order, regulation, decree or award of any governmental authority or arbitral body to which it or its properties or operations is subject.

\11097692.4

16. _Change of Status_. Any Guarantor that is a business entity shall not enter into any consolidation, merger, or other combination unless Guarantor is the surviving business entity. Further, Guarantor shall not change its legal structure unless (a) Guarantor obtains the prior written consent of Bank and (b) all Guarantor's obligations under this Guaranty are assumed by the new business entity.

17. _Defaults_. Any one or more of the following shall be a default hereunder: (a) any Indebtedness is not paid when due, or any default occurs under any agreement relating to the Indebtedness, including any Bank Agreement, after giving effect to any applicable grace or cure periods; and (b) Guarantor breaches any term, provision, warranty or representation under this Guaranty. In the event that there shall occur and be continuing a default, then notwithstanding any collateral or other security or credit support for the Indebtedness, at Bank's election and without notice thereof or demand therefore, Guarantor's obligations under this Guaranty shall immediately be and become due and payable.

18. _Remedies_. All remedies hereunder are cumulative and are not exclusive of any other rights and remedies of Bank provided by law or under the Bank Agreements or other applicable agreements or instruments. If Guarantor fails to fulfill its duty to pay all Indebtedness guaranteed hereunder, Bank shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law. Without limiting the foregoing to the extent permitted by law, Bank may, at its option and without notice or demand:

(a) declare any Indebtedness due and payable at once;

(b) take possession of any collateral pledged by Borrower or Guarantor, wherever located, and sell, resell, assign, transfer, and deliver all or any part of the collateral at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Bank may impose reasonable conditions upon any such sale. Further, Bank, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of the collateral to be sold, free from and discharged of all trusts, claims, rights of redemption and equities of Borrower or Guarantor whatsoever. Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker, or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided herein; and

(c) set off against any or all liabilities of Guarantor all money owed by Bank or any of its agents or affiliates in any capacity to Guarantor, whether or not due, and also set off against all other liabilities of Guarantor to Bank all money owed by Bank in any capacity to Guarantor. If exercised by Bank, Bank shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books subsequent thereto.

19. _Notices_. Guarantor hereby designates Borrower as its representative and agent for delivery or receipt of communications. All notices required under this Guaranty shall be personally delivered or sent by first class mail, postage prepaid, by overnight courier or by facsimile, (a) to any Guarantor: at Borrower's address listed on the signature page of this Guaranty and (b) to Bank: at the address on the signature page of this Guaranty, or to such other addresses as Bank and Guarantor may specify from time to time in writing. Notices sent by (i) first class mail shall be deemed delivered on the earlier of actual receipt or on the fourth business day after deposit in the U.S. mail, postage prepaid, (ii) overnight courier shall be deemed delivered on the next business day, and (iii) telecopy shall be deemed delivered when transmitted.

20. _Successors and Assigns_. This Guaranty (a) binds Guarantor and Guarantor's executors, administrators, successors, and assigns, provided that Guarantor may not assign its rights or

obligations under this Guaranty without the prior written consent of Bank, and (b) inures to the benefit of Bank and Bank's indorsees, successors, and assigns. Bank may, without notice to Guarantor and without affecting Guarantor's obligations hereunder, sell, assign, grant participations in, or otherwise transfer to any other person, firm, or corporation the Indebtedness and this Guaranty, in whole or in part. Guarantor agrees that Bank may disclose to any assignee or purchaser, or any prospective assignee or purchaser, of all or part of the Indebtedness any and all information in Bank's possession concerning Guarantor, this Guaranty, and any security for this Guaranty.

21.  Amendments, Waivers, and Severability.  No provision of this Guaranty may be amended or waived except in writing.  No failure by Bank to exercise, and no delay in exercising, any of its rights, remedies, or powers shall operate as a waiver thereof, and no single or partial exercise of any such right, remedy, or power shall preclude any other or further exercise thereof or the exercise of any other right, remedy, or power.  If a court of competent jurisdiction finds any provision of this Guaranty to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance.  If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable.  If the offending provision cannot be so modified, it shall be considered deleted from this Guaranty.  Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Guaranty shall not affect the legality, validity or enforceability of any other provision of this Guaranty.

22.  Attorneys' Fees; Expenses.  Guarantor agrees that if Bank hires an attorney to help enforce this Guaranty, Guarantor will pay, subject to any limits under applicable law, Bank's attorneys' fees and all of Bank's other collection expenses, whether or not there is a lawsuit and including without limitation additional legal expenses for bankruptcy proceedings.

23.  Governing Law; Choice of Venue; Jury Waiver.  This Guaranty will be governed by federal law applicable to Bank and, to the extent not preempted by federal law, the laws of the Commonwealth of Virginia without regard to its conflicts of law provisions.  This Guaranty has been accepted by Bank in the Commonwealth of Virginia.  If there is a lawsuit, Guarantor agrees upon Bank's request to submit to the jurisdiction of the applicable Courts for the City of Richmond, Commonwealth of Virginia. ALL PARTIES TO THIS GUARANTY HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY.

24.  Dispute Resolution Provision.  This paragraph, including the subparagraphs below, is referred to as the "Dispute Resolution Provision." This Dispute Resolution Provision is a material inducement for the parties entering into this Guaranty.

(a)  This Dispute Resolution Provision concerns the resolution of any controversies or claims between the parties, whether arising in contract, tort or by statute, including but not limited to controversies or claims that arise out of or relate to: (i) this Guaranty (including any renewals, extensions or modifications); or (ii) any document related to this Guaranty (collectively a "Claim"). For the purposes of this Dispute Resolution Provision only, the term "parties" shall include any parent corporation, subsidiary or affiliate of the Bank involved in the servicing, management or administration of any obligation described or evidenced by this Guaranty.

(b)  At the request of any party to this Guaranty, any Claim shall be resolved by binding arbitration in accordance with the Federal Arbitration Act (Title 9, U.S. Code) (the "Act"). The Act will apply even though this Guaranty provides that it is governed by the law of a specified state.

(c)  Arbitration proceedings will be determined in accordance with the Act, the then-current rules and procedures for the arbitration of financial services disputes of the American Arbitration Association or any successor thereof ("AAA"), and the terms of this Dispute Resolution Provision.  In the event of any inconsistency, the terms of this Dispute Resolution Provision shall

\11097692.4

control. If AAA is unwilling or unable to (i) serve as the provider of arbitration or (ii) enforce any provision of this arbitration clause, the Bank may designate another arbitration organization with similar procedures to serve as the provider of arbitration.

(d) The arbitration shall be administered by AAA and conducted, unless otherwise required by law, in any U.S. state where real or tangible personal property collateral for this credit is located or if there is no such collateral, in the state specified in the governing law section of this Guaranty. All Claims shall be determined by one arbitrator; however, if Claims exceed Five Million Dollars ($5,000,000), upon the request of any party, the Claims shall be decided by three arbitrators. All arbitration hearings shall commence within ninety (90) days of the demand for arbitration and close within ninety (90) days of commencement and the award of the arbitrator(s) shall be issued within thirty (30) days of the close of the hearing. However, the arbitrator(s), upon a showing of good cause, may extend the commencement of the hearing for up to an additional sixty (60) days. The arbitrator(s) shall provide a concise written statement of reasons for the award. The arbitration award may be submitted to any court having jurisdiction to be confirmed and have judgment entered and enforced.

(e) Except as waived by Guarantor in this Guaranty, the arbitrator(s) will give effect to statutes of limitation in determining any Claim and may dismiss the arbitration on the basis that the Claim is barred. For purposes of the application of any statutes of limitation, the service on AAA under applicable AAA rules of a notice of Claim is the equivalent of the filing of a lawsuit. Any dispute concerning this arbitration provision or whether a Claim is arbitrable shall be determined by the arbitrator(s), except as set forth at subparagraph (h) of this Dispute Resolution Provision. The arbitrator(s) shall have the power to award legal fees pursuant to the terms of this Guaranty.

(f) This paragraph does not limit the right of any party to: (i) exercise self-help remedies, such as but not limited to, setoff; (ii) initiate judicial or non-judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial or power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies.

(g) The filing of a court action is not intended to constitute a waiver of the right of any party, including the suing party, thereafter to require submittal of the Claim to arbitration.

(h) Any arbitration or trial by a judge of any Claim will take place on an individual basis without resort to any form of class or representative action (the "Class Action Waiver"). Regardless of anything else in this Dispute Resolution Provision, the validity and effect of the Class Action Waiver may be determined only by a court and not by an arbitrator. The parties to this Guaranty acknowledge that the Class Action Waiver is material and essential to the arbitration of any disputes between the parties and is nonseverable from the agreement to arbitrate Claims. If the Class Action Waiver is limited, voided or found unenforceable, then the parties' agreement to arbitrate shall be null and void with respect to such proceeding, subject to the right to appeal the limitation or invalidation of the Class Action Waiver. **The Parties acknowledge and agree that under no circumstances will a class action be arbitrated.**

25. Counterparts. This Guaranty may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

\11097692.4

26.    FINAL AGREEMENT.  BY SIGNING THIS DOCUMENT EACH PARTY
REPRESENTS AND AGREES THAT:  (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT
BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT
SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF
TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH
COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND
CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN
ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE
CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL
AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

The parties executed this Guaranty as of April 14, 2010, intending to create an instrument
executed under seal.

BANK OF AMERICA, N.A.


By: _____

Title: _____


Address for Notices:
101 North Tryon Street
NC1-001-13-26
Charlotte, NC  28255


GUARANTOR:

MMR HOLDINGS, INC., a Virginia
Corporation


By: _____ (Seal)
     Neil Burgess
     Title: CEO


OPENSIDED MRI OF ATLANTA, LLC,
a Virginia limited liability company

By:  MMR Holdings, Inc., its Manager

     By: _____ (Seal)
          Neil Burgess
          Title:    CEO

**OPENSIDED MRI OF CLEVELAND, LLC, a
Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

      By: _____(Seal)
           Neil Burgess
      Title:   CEO


**OPENSIDED MRI OF DENVER, LLC, a
Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

      By: _____(Seal)
           Neil Burgess
      Title:   CEO


**OPENSIDED MRI, LLC, a Virginia limited
liability company**

By:  MMR Holdings, Inc., its Manager

      By: _____(Seal)
           Neil Burgess
      Title:   CEO


**OPENSIDED MRI OF KANSAS, LLC, a
Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

      By: _____(Seal)
           Neil Burgess
      Title:   CEO


**OPENSIDED MRI OF LAS VEGAS, LLC, a
Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

      By: _____(Seal)
           Neil Burgess
      Title:   CEO

**OPENSIDED MRI OF LOUISVILLE, LLC, a
Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

    By: _____(Seal)
           Neil Burgess
    Title:   CEO

**OPENSIDED MRI OF NEW ORLEANS, LLC,
a Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

    By: _____(Seal)
           Neil Burgess
    Title:   CEO

**OPENSIDED MRI OF OKLAHOMA CITY,
LLC, a Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

    By: _____(Seal)
           Neil Burgess
    Title:   CEO

**OPENSIDED MRI OF ORANGE COUNTY,
LLC, a Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

    By: _____(Seal)
           Neil Burgess
    Title:   CEO

**OPENSIDED MRI OF SAN ANTONIO, LLC, a
Virginia limited liability company**

By:  MMR Holdings, Inc., its Manager

    By: _____(Seal)
           Neil Burgess
    Title:   CEO

26.    <u>FINAL AGREEMENT</u>. BY SIGNING THIS DOCUMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS DOCUMENT REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS DOCUMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS DOCUMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

The parties executed this Guaranty as of April 14, 2010, intending to create an instrument executed under seal.

BANK OF AMERICA, N.A.

By: _____

Title: _____

Address for Notices:
101 North Tryon Street
NC1-001-13-26
Charlotte, NC  28255

GUARANTOR:

MMR HOLDINGS, INC., a Virginia Corporation

By: _____ (Seal)
Neil Burgess
Title: CEO

OPENSIDED MRI OF ATLANTA, LLC, a Virginia limited liability company

By:  MMR Holdings, Inc., its Manager

By: _____ (Seal)
Neil Burgess
Title:    CEO

**OPENSIDED MRI OF CLEVELAND, LLC, a**
**Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

   By: _____(Seal)
         Neil Burgess
   Title:   CEO

**OPENSIDED MRI OF DENVER, LLC, a**
**Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

   By: _____(Seal)
         Neil Burgess
   Title:   CEO

**OPENSIDED MRI, LLC, a Virginia limited**
**liability company**

By: MMR Holdings, Inc., its Manager

   By: _____(Seal)
         Neil Burgess
   Title:   CEO

**OPENSIDED MRI OF KANSAS, LLC, a**
**Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

   By: _____(Seal)
         Neil Burgess
   Title:   CEO

**OPENSIDED MRI OF LAS VEGAS, LLC, a**
**Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

   By: _____(Seal)
         Neil Burgess
   Title:   CEO

**OPENSIDED MRI OF LOUISVILLE, LLC, a
Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

   By: _____(Seal)
       Neil Burgess
   Title:   CEO

**OPENSIDED MRI OF NEW ORLEANS, LLC,
a Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

   By: _____(Seal)
       Neil Burgess
   Title:   CEO

**OPENSIDED MRI OF OKLAHOMA CITY,
LLC, a Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

   By: _____(Seal)
       Neil Burgess
   Title:   CEO

**OPENSIDED MRI OF ORANGE COUNTY,
LLC, a Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

   By: _____(Seal)
       Neil Burgess
   Title:   CEO

**OPENSIDED MRI OF SAN ANTONIO, LLC, a
Virginia limited liability company**

By: MMR Holdings, Inc., its Manager

   By: _____(Seal)
       Neil Burgess
   Title:   CEO